**BEACON FLAG CAR CO., INC.
(DORIS WEYANT),**
Petitioner

v.

**UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW,**
Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 18, 2006.

Decided Oct. 31, 2006.

*Board,* 60 Pa.Cmwlth. 338, 431 A.2d 1114, 1116 (1981).

Donald J. Byrnes, Altoona, for petitioner.

Maribeth Wilt–Seibert, Asst. Counsel and Gerard M. Mackarevich, Deputy Chief Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, FRIEDMAN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge FRIEDMAN.

Beacon Flag Car Co., Inc. (BFC) petitions for review of the April 19, 2006, order of the Unemployment Compensation Board of Review (UCBR), which affirmed the decision of a referee to grant unemployment compensation benefits to Michael Vaughn (Claimant) based upon a determination that Claimant was an employee of BFC rather than a self-employed, independent contractor. We reverse.

Claimant provides flag car services to clients of BFC under an Independent Contractor Agreement dated August 19, 2005. (UCBR's Findings of Fact, Nos. 2, 6; R.R. at 1a–4a.) Claimant's separation from this employment is not at issue in this appeal, (UCBR's Findings of Fact, No. 1); instead, we are asked to determine whether Claimant was an employee of BFC or was a self-employed, independent contractor and, therefore, ineligible for unemployment compensation benefits under sections 402(h) and 4(*l*)(2)(B) of the Unemployment Compensation Law ˜ (Law),[1] 43 P.S. § 802(h) and 43 P.S. § 753(*l*)(2)(B).

On December 15, 2005, Claimant certified a self-employment form by phone, acknowledging that he was the sole proprietor of his own driving business and identifying BFC as a dispatch center that provides him with leads. (R.R. at 25a–28a.) By decision mailed January 27, 2006, the Altoona Unemployment Compensation Service Center (Service Center) determined that Claimant was not self-employed, and, therefore, Claimant was eligible for unemployment compensation benefits for claim weeks ending December 17, 2005, through January 14, 2006. (R.R. at 6a.) BFC appealed the Service Center's determination, and a referee conducted a hearing on the matter on February 23, 2006. At the hearing, Doris Weyant, owner of BFC, appeared and presented evidence; Thomas Carson, a UC examiner, attended as a representative of the Service Center but did not testify; Claimant did not appear or otherwise participate.

Weyant's testimony about the nature of BFC's business and the type of service that Claimant provided to BFC may be summarized as follows. BFC is a dispatch service that locates clients who are in need of flag car (also called pilot car or escort car) drivers to accompany oversized loads on trips.[2] The client contacts BFC and

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §§ 802(h) and 753(*l*)(2)(B).

2. The provisions of the Independent Contractor Agreement set forth the following information. BFC is in the business of providing resource services to assist trucking companies and shippers with trips requiring the services of pilot or escort vehicles, such as those operated by Claimant. Claimant is an independent contractor in the business of providing the "pilot services" to such trucking companies and shippers; that is, Claimant provides pilot or escort vehicles and driver services for

tells BFC how many drivers are needed for a particular trip. BFC then contacts drivers from a pool of drivers maintained by the company and places the driver with the trip. Claimant called Weyant and asked to sign on with BFC and provide his services as a driver in August of 2005. Drivers, including Claimant, are free to accept or decline any offered trip, and they are encouraged to promote their own business. BFC does not provide vehicles to the drivers. Some drivers have their own vehicles; however, others lease equipped vehicles, either from Jim Weyant Transport[3] (JWT) or some other leasing company. BFC prepares and forwards all paperwork to the client, negotiates the fee with the client up front and, before the trip, tells the driver what he will be paid per mile. Depending on the client and type of load being escorted, drivers receive from $.33 to $.59 per mile. After completing a trip, drivers have the clients sign a driving service receipt so that BFC may issue an invoice. BFC collects the money due from the client and provides drivers with their fee; BFC gets ten percent of the per mile fee paid by the client, and, if the driver leases from JWT, JWT gets the remainder for the lease payment. If a client does not pay BFC, the driver still receives his or her promised fee and BFC absorbs any losses for the uncollected money. (R.R. at 33a–36a, 39a.) Claimant does not report to BFC's office for assignments but, instead, is told where a particular trip will start; Claimant is not required to attend any meetings and receives no training. (R.R. at 40a–41a.) BFC provides Claimant with a 1099 income tax form rather than a W–2 form. (R.R. at 46a.)

In performing his services for BFC, Claimant drives a flag car leased from JWT, which is exclusively for his use. Under the motor vehicle lease agreement between Claimant and JWT,[4] JWT provides all the equipment necessary for Claimant to perform his job and pays to keep the car maintained.[5] (R.R. at 5a.) Claimant is responsible for personal expenses on the road such as meals and lodging, but JWT pays for the car's operating costs. Drivers are free to contact clients and make their own agreements; however, if a driver who leases from JWT does so, he must call

the purpose of safely piloting oversize and/or overweight loads on trips as required by certain government authorities. BFC from time to time may identify clients requiring pilot services for a given trip or load, ascertain the dates and time of departure and arrival, and where the origin and destination points are within Claimant's area of operation, provide dispatch services to Claimant on a per trip basis, which Claimant is free to accept or reject. (R.R. at 1a.)

3. JWT is owned by Jim Weyant, who is Weyant's husband. (R.R. at 35a.)

4. At the hearing, Weyant sought to enter the lease agreement between Claimant and JWT into the record, and the referee rejected Carson's objection to its admission. (R.R. at 34a, 36a.)

5. Under the Independent Contractor Agreement, BFC requires that its flag drivers: (i) be properly trained, licensed and certified under the applicable laws, rules or regulations governing pilot car services as may be adopted by government authorities; (ii) have and properly use all necessary equipment and signs on vehicles; and (iii) have adequate personal and vehicle insurance and maintain vehicles in a safe and reliable condition. (R.R. at 1a.) Under the motor vehicle lease agreement, while the vehicle is used to provide flag car services for BFC, JWT is responsible for: repairing and servicing the vehicle; maintaining insurance on the vehicle; and providing the necessary equipment for the vehicle to perform as a flag car, including CB radios, "Oversize Load" banners, pilot vehicle door signs, roof mounted flashing amber lights, mounted angled flags on the pilot vehicle roof rack, calibrated height poles and other miscellaneous equipment. (R.R. at 5a.)

JWT to ensure that JWT will get its lease money and BFC will get its ten percent from the trip. (R.R. at 34a–37a, 41a–42a.)

Following the hearing, the referee issued a decision in which he affirmed the Service Center's determination that Claimant was BFC's employee and granted Claimant claim credit for the compensable weeks at issue. (R.R. at 8a–10a.)

BFC then appealed to the UCBR, which made its own findings based on the testimony and documentary evidence. Most relevantly, the UCBR found:

> 9. The claimant's motor vehicle lease agreement with JWT restricts the use of the motor vehicle solely for escort services to BFC and no personal use.

. . .

> 15. In the agreement between the claimant and BFC, the claimant agreed not to directly or indirectly compete with BFC during the period of the agreement and for 18 months following the termination of the agreement.

(UCBR Findings of Fact, Nos. 9, 15.) Based on these findings, the UCBR concluded that Claimant is subject to BFC's direction and control in the performance of his escort duties [6] and that Claimant is not engaged in an independent established trade because Claimant is bound to provide the service exclusively for BFC under his motor vehicle lease agreement [7] and under the non-compete clause in the independent contractor agreement.[8] (UCBR

---

6. This conclusion differed from that of the Service Center, which specifically found that Claimant was free from BFC's direction or control in the performance of his job. (Service Center's Findings of Fact, No. 4.) The Service Center nevertheless determined that Claimant was not self-employed because he was not at risk of sustaining a profit or a loss. (Service Center's Findings of Fact, No. 5.) (R.R. at 6a.) This reasoning was rejected by our supreme court in *Viktor, Ltd. v. Department of Labor and Industry*, 586 Pa. 196, 892 A.2d 781 (2006).

7. The motor vehicle lease agreement provides, in relevant part:
> This Vehicle Lease Agreement is being entered into solely for the purpose of providing escort services under the Independent Contractor Agreement with the following pilot service companies:
> *BEACON*
>
> ————
>
> I. VEHICLE USE—You will not use this vehicle for any purpose other than for escort dispatching under the contract agreements referred to above....

(R.R. at 5a.)

8. The Independent Contractor Agreement between Claimant and BFC provides, in relevant part:

8. Non-disclosure and Non-competition. As an inducement for [BFC] to contract with [Claimant], [Claimant] hereby agrees not to directly or indirectly compete with the business of the Company and its successors and assigns during the period of the Independent Contractor Agreement and for a period of eighteen (18) months following termination of the Independent Contractor Agreement and notwithstanding the cause or reason for the termination of the Agreement. The term "non-compete" as used herein shall mean that [Claimant] shall not own, manage, operate, consult or be employed in a business substantially similar to, or competitive with, the present business of the Company or such other business activity in which the Company may substantially engage during the term of the Agreement independent of the involvement of [BFC]. [Claimant] acknowledges that the Company shall or may in reliance of this agreement provide [Claimant] access to trade secrets, clients and other confidential data and good will.... This non-compete agreement shall extend only for a radius of 300 miles from the present location of the Company and shall be in full force and effect for eighteen (18) months commencing with the date of termination of the Independent Contractor Agreement.

(R.R. at 3a.)

op. at 3.) Thus, the UCBR held that Claimant cannot be held ineligible for benefits under sections 402(h) and 4(*l*)(2)(B) of the Law and affirmed the grant of benefits. (R.R. at 13a–16a.)

■ On appeal to this court,[9] BFC argues that the UCBR erred in holding that BFC failed to satisfy its burden of proving that Claimant was a self-employed, independent contractor disqualified from receiving unemployment benefits.[10] BFC relies on our supreme court's recent decision in *Viktor, Ltd. v. Department of Labor and Industry,* 586 Pa. 196, 892 A.2d 781 (2006), in which our supreme court held that limousine companies successfully established that their drivers were independent contractors rather than employees of the company. According to BFC, *Viktor,* which was ignored by both the referee and the UCBR, requires reversal of the UCBR's decision finding Claimant to be an employee eligible for unemployment compensation benefits.

■ Section 402(h) of the Law, 43 P.S. § 802(h), provides that an employee shall be ineligible for compensation for any week in which he or she is engaged in self-employment. The term "self-employment" is not defined in the Law; however, the courts have utilized section 4(*l*)(2)(B) of the Law, 43 P.S. § 753(*l*)(2)(B), to fill the void because its obvious purpose is to exclude independent contractors from coverage. *Krum v. Unemployment Compensation Board of Review,* 689 A.2d 330 (Pa.

Cmwlth.1997). That section provides, in relevant part:

(2)(B) Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that—

(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and

(b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.

43 P.S. § 753(*l*)(2)(B). This provision presumes that an individual is an employee, as opposed to an independent contractor, but this presumption may be overcome if the putative employer sustains its burden of showing that the claimant was free from control and direction in the performance of his service and that, as to such service, was customarily engaged in an independent trade or business. *Krum; Crenshaw v. Unemployment Compensation Board of Review,* 50 Pa.Cmwlth. 136, 412 A.2d 682 (1980); *Kardon v. Unemployment Compensation Board of Review,* 40 Pa.Cmwlth. 20, 396 A.2d 487 (1979). Unless both of these showings are made, the presumption stands that one who performs services for wages is an employee. *York Newspaper Company v. Unemployment Compensation Board of Review,* 160 Pa.Cmwlth. 475,

9. Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. Whether Claimant is an employee or an independent contractor is a determination of law subject to our review. *Krum v. Unemployment Compensation Board of Review,* 689 A.2d 330 (Pa.Cmwlth.1997).

10. BFC also maintains that the referee and the UCBR both denied BFC a fair hearing and capriciously disregarded competent evidence by their deliberate disbelief of Weyant, an apparently trustworthy witness. After careful review of the record, we dismiss this argument as baseless.

635 A.2d 251 (1993), *appeal denied,* 538 Pa. 652, 647 A.2d 906 (1994); *Kardon.* BFC contends that both of the two requisite elements were met. We agree.

■ The first element—the issue of control—is based upon a showing of control, not only with regard to the work to be done, but also with regard to the manner of performing it. *Erie Independence House, Inc. v. Unemployment Compensation Board of Review,* 126 Pa.Cmwlth. 358, 559 A.2d 994 (1989). Here, the record and findings clearly support the conclusion that BFC does not control, or have authority to control, Claimant's day-to-day operations in the performance of his work. For example: (1) the client, not BFC, determines the time, place and destination of the trip; (2) BFC does not determine the route for its drivers or require drivers to report on their progress; (3) BFC does not supervise drivers; (4) BFC provides no training or equipment for its drivers and does not require drivers to attend any meetings or report to a workplace; (5) drivers are free to make their own arrangements with clients, so long as BFC and JWT are appropriately compensated; (6) BFC pays drivers job to job on a per mile basis rather than an hourly wage; and, most importantly, (7) drivers are free to refuse any client or trip without repercussions.

Notwithstanding these factors that indicate a lack of control by BFC, the UCBR argues that the existence of the motor vehicle lease agreement and the non-compete clause in the Independent Contractor Agreement establish that Claimant is subject to BFC's control and direction. We cannot agree that either of these documents shows that BFC exercised, or had the right to exercise, actual control over the manner in which Claimant performed his services.

Indeed, as to the motor vehicle lease agreement, we conclude that the UCBR erroneously considered this document as relevant in determining whether Claimant was an employee of BFC under either prong of the statutory test. As acknowledged by the UCBR, Claimant's motor vehicle lease agreement with JWT was completely separate from his independent contractor agreement with BFC and independent of the terms of that agreement. (UCBR's Findings of Fact, No. 5.) In fact, the uncontradicted evidence established that BFC's flag car drivers were not required to lease from JWT; they could use their own vehicle or lease a flag car from a different company to perform their services. Thus, whatever restrictions may be imposed on Claimant under the motor vehicle lease agreement with JWT, these are of no moment with respect to the issue before the court.

With respect to the non-compete clause included in the Independent Contractor Agreement, this court has previously rejected the contention that the mere existence of such a clause renders the party agreeing to it an employee of the other party. *Electrolux Corporation v. Department of Labor and Industry, Bureau of Employer Tax Operations,* 705 A.2d 1357 (Pa.Cmwlth.1998), *appeal discontinued,* 555 Pa. 722, 724 A.2d 936 (1998). In *Electrolux,* we concluded that such a clause did not outweigh the numerous other factors that weighed in favor of finding an absence of control. *Id.* Viewing all the factors in this case as a whole, we reach the same conclusion.

■ As to the second element—whether Claimant conducts his driving services as an "independently established" business—the courts have identified two factors as important in making this evaluation: (1) whether the individual was capable of performing the activities in question for anyone who wished to avail themselves of the services; and (2) whether the nature of the

business compelled the individual to look to only a single employer for the continuation of such services. *Venango Newspapers v. Unemployment Compensation Board of Review,* 158 Pa.Cmwlth. 379, 631 A.2d 1384 (1993).

In asserting that BFC failed to meet this second element, the UCBR contends that Claimant was not free to drive a flag car for anyone who wished to avail themselves of this service where he was subject to a non-compete restriction during his employment with BFC and for eighteen months following any separation. In addition, the UCBR maintains that, where BFC absorbed any loss associated with non-payment from the client, Claimant was not engaged in an independently established business. (UCBR's brief at 17.) However, in light of our supreme court's decision in *Viktor,* we cannot agree with the UCBR's conclusion that these factors are dispositive of the matter.

First, in *Viktor,* the court dismissed the notion that one cannot be an independent contractor unless he bears the entire financial risk associated with the enterprise at issue. In addition, the court held that, while the ability to work for more than one enterprise is an important factor in determining independent contractor status pursuant to section 4(*l*)(2)(B), it was not the only factor; rather, the unique facts of each case must be examined in order to resolve the question of employee versus independent contractor status. The court stressed that "[t]he relevant word that we must analyze with respect to determining whether Drivers satisfied the second prong of the test is 'independent.'" *Viktor,* 586

Pa. at 218, 892 A.2d at 794. In that regard, the court stated:

> The record in the instant matter indicated that Drivers could select what assignments they wanted to accept or reject.... This factor supports the finding that Drivers were engaged in their own independently established businesses. At the Henderson hearing, a Driver testified that he is neither required nor expected to call in to Henderson at any time with respect to his availability. *It is difficult to fathom a situation where someone other than an individual engaged in his or her own business would possess the unmitigated prerogative to accept or reject assignments at will, to work only when he or she chose to ... and to perform the services however he or she saw fit to do so.*

*Id.* at 222, 892 A.2d at 797 (citation omitted) (footnote omitted) (emphasis added).

Although *Viktor* did not involve a non-compete agreement, pursuant to the analysis in that case, this factor is but one of the many that we must consider in assessing the unique facts before us. We conclude that, by itself, the existence of the non-compete agreement is not dispositive and that, under the totality of the circumstances presented here, BFC sustained its burden under the second prong of section 4(*l*)(2)(B).[11]

Accordingly, because we hold that Claimant was a self-employed, independent contractor, we reverse.

## ORDER

AND NOW, this 31st day of October, 2006, the order of the Unemployment

---

11. Because non-compete agreements are disfavored in Pennsylvania, and generally are unenforceable, *see Zimmerman v. Unemployment Compensation Board of Review,* 836 A.2d 1074 (Pa.Cmwlth.2003), we are particularly loathe to hold that the mere existence of such an agreement places the parties involved in an employer-employee relationship as a matter of law.

Compensation Board of Review, dated April 19, 2006, is hereby reversed.