**STAGE ROAD POULTRY CATCHERS,**
**Petitioner**

**v.**

**COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF LABOR AND INDUSTRY, OFFICE OF UNEMPLOYMENT COMPENSATION, TAX SERVICES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 6, 2011.

Decided Dec. 29, 2011.

---

Cory A. Iannacone, Harrisburg, for petitioner.

Christopher G. Giovanis and Arthur Selikoff, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and LEAVITT, Judge, and BROBSON, Judge (P.).

OPINION BY Judge BROBSON.

Petitioner Stage Road Poultry Catchers, a joint venture (Stage Road or the Joint Venture), petitions for review of a final decision and order of the Department of Labor and Industry (the Department) dated November 9, 2010, which denied the Joint Venture's petition for reassessment of unemployment compensation tax assessed by the Department's Office of Unemployment Compensation Tax Services (Tax Services).[1] We now reverse the Department's order.

## I. Background

At the outset, we begin by noting that the Joint Venture is organized pursuant to two agreements, the first agreement effective January 6, 2003 (the 2003 Joint Ven-

---

1. This matter was argued seriately with *Stage Road Poultry Catchers, LLC v. Commonwealth of Pennsylvania, Department of Labor and In-* *dustry, Office of Unemployment Compensation, Tax Services,* docketed with this Court at 2616 C.D. 2010.

ture Agreement), and the second agreement effective November 1, 2006 (the 2006 Joint Venture Agreement) (collectively the Joint Venture Agreements).[2] (Reproduced Record (R.R.) at 675a–78a.) The stated "purpose of the joint venture is to conduct on a job-by-job basis, as co-owners for profit, the business of providing the service to poultry growers of catching their poultry for shipment to market." (*Id.*) John W. Snook and Jane E. Snook are designated as the "General Agents" of the Joint Venture. (*Id.*) Although the Joint Venture Agreements provide that the members of the joint venture each "shall have an equal voice in the affairs of the joint venture and an equal share in its net profits and net losses," the agreements also provide that the General Agents are appointed

> to do every act and thing which either of them deems necessary or desirable to advance the interests of [the Joint Venture], . . . including, but not limited to, . . . representing [the Joint Venture] to poultry growers, providing transportation to and from catching jobs, providing a fork lift with an operator whenever needed, collecting all amounts due and payable to [the Joint Venture], paying all expenses incurred in connection with [the Joint Venture's] business, and distributing net profits among [the Joint Venture's members] as soon as feasible after each poultry catching job.

(*Id.*)

The Joint Venture Agreements provide that "[th]e General Agents shall receive a guaranteed payment of $0.006 per pound for each job where 60,000 live pounds of poultry or less are caught and of $0.003 per pound for each job where more than 60,000 pounds of live poultry are caught." (*Id.*) The guaranteed payment, which is deducted to determine net profits for each job, is applied first to expenses and then for the General Agents' services. (*Id.*)

On September 30, 2008, Tax Services filed a notice of assessment against the Joint Venture members (Catchers) for wages paid for poultry catching services performed by the Catchers from the first quarter of 2004 through the fourth quarter of 2006, based on Tax Services' determination that the Catchers were employees of the Joint Venture.[3] On January 11, 2010, Tax Services filed an additional notice of assessment against the Joint Venture for wages paid to the Catchers for poultry catching services performed from the fourth quarter of 2006 through the fourth quarter of 2008, again based on its determination that the Catchers were employees of the Joint Venture.[4] The Joint Venture petitioned the Department for reassessment of the September 30, 2008 assessment and the January 11, 2010 assessment (collectively referred to as the Assessments), on October 15, 2008 and January 20, 2010, respectively. In its petitions for reassessment, the Joint Venture maintained that Tax Services improperly deemed the Catchers to be employees of the Joint Venture.

---

2. The Joint Venture Agreements are substantially the same, with the most significant exception being that the 2006 Joint Venture Agreement includes an additional section entitled "Participation in a Joint Venture." (R.R. at 675–78a.) A reference to the Joint Venture Agreements refers only to the common elements of the two agreements. Differences between the two agreements, where relevant, will be identified in this Opinion.

3. The notice of assessment assessed $177,803.85 in contributions, $45,843.73 in interest, and $3,000 in penalties. (R.R. at 155a.)

4. The second notice of assessment assessed $120,202.00 in contributions, $25,716.82 in interest, and $1,250.00 in penalties. (R.R. at 616a.)

The Department conducted a combined fact-finding hearing for both reassessment petitions on March 3, 2010, at 9:30 a.m., during which Jeffrey Frey, an unemployment compensation tax agent employed by Tax Services, Jane Snook, a general agent of the Joint Venture, and Robert Church, the Joint Venture's accountant, testified.

Of particular relevance to the matters now before the Court, Mrs. Snook testified to the manner in which Stage Road operates its chicken catching business. Mrs. Snook explained that chicken *processors* own the chickens, chicken *farmers* raise the chickens, and *Catchers* catch the chickens so that the chickens may be delivered to the processors. (R.R. at 79a–80a.) The processors pay the Catchers for their catching services based on the total number of pounds of chickens that are caught at a particular facility at a particular time. (R.R. at 80a.)

As to how Stage Road gets Catchers for each job, Mrs. Snook testified that Stage Road does not have a set group of Catchers, and she explained that the group of Catchers could be different for each job. (*Id.*) She receives at least seven or eight calls a day from new individuals, inquiring about chicken catching opportunities. (*Id.*) She explained the process as follows:

Q. But how do they know to call you? Do you go out there and advertise and say I'm in the business of catching chickens, or do people just communicate with one another?

A. Yeah. They know, and they tell each other. Like not everybody even calls me.

Q. Is this by word—I'm sorry.

A. Yeah. So I might not know exactly—I can't even keep a list who calls me because they tell each other, and that person don't even call in sometimes.

Q. So you get one of these faxes in, and you're also receiving phone calls throughout the day?

A. Right.

Q. From these catchers. How long do you take these phone calls to? Is there a point where you stop taking the phone calls?

A. No; 24–7.

Q. But is there a point where you have enough people for a job though where you would say—

A. Oh, yes, yes, yes. Sometimes it happens because they don't always call in, we might get—see, we leave our house, and everybody knows our route. So we usually have a store that we stop at, and we tell the people 'cause a lot of people that we work with don't have a license, they don't just have jobs, and they come, and they know where we're going to be at.

And we might get there, and there might be twelve of them there. And they don't want to go with twelve people, because if they get—if we only catch 30,000 pounds, and say you get a cent a pound, $300; that ain't going to give much to twelve people for a job. So some of them will offer to go home then, like we're not going. We're not going to make no money to do this.

Q. Did you ever have an example where not enough people called in?

A. Yes.

Q. What did you do in those circumstances?

A. It just makes it tough. It makes it for a long night.

Q. Because you're doing the same job, just with less people?

A. Yes. The chickens have to be caught. There is never a time you can say I can't catch those chickens

because the processor plants need them.

Q. Whose decision was it if someone works or does not work? Do you decide if someone works or they don't work, or is it the catchers who just make the decision whether they want to work one day?

A. They decide.

Q. So they can just call up and say I just don't feel like working today.

A. Right.

Q. Or they just don't call.

(R.R. at 86a–88a.)

Mrs. Snook testified that once at the farm, the group of Catchers work together to determine the different jobs that each will perform. She explained the various tasks and division of labor among the Catchers as follows:

Q. Are there different jobs the catchers do?

A. Yes. Sometimes we—if we catch for Penfield, they provide a forklift, so everybody catches in the barn. But if we catch for Clark's Feed, they have us load chicken trucks with crates, so some people have to go out in the truck, and some in the chicken house.

Q. Some people are loading, some people are just catching?

A. Right.

Q. Do you make that determination and say catcher 1, 2, 3 is going to load, catcher 4, 5, 6 is going—

A. No.

Q. Who makes that determination?

A. Just the whole group. Nobody—

Q. The catchers themselves?

A. Right. I mean, it's—

Q. There's a—it sounds like—is there a set job just getting the chickens caught so they can be—is that the

end result that's trying to be accomplished?

A. Right.

Q. Do you care how they perform the work to get the chickens caught?

A. No, but we all do care; the whole group cares because we don't get paid if we would put dead chickens in the truck. We don't get paid for that weight. They would take it off of our pay that they pay us all, because I think it's a dollar a bird. Like they would take it off, that they would charge; you know, they wouldn't pay us.

Q. I guess the end result then is loading live chickens, not dead chickens.

A. Right.

Q. So as long as live chickens, healthy chickens are loaded, that's all you care about?

A. Right. That's all the catchers care about, too. We all work together. It's a—

(R.R. at 88a–89a.)

Mrs. Snook further testified that Stage Road does not supervise the Catchers. (R.R. at 102a.) When the Catchers go to a job, they work together as a group and "nobody is the boss." (*Id.*) Stage Road does not provide any specific training or instruction as to how the Catchers should catch the chickens (R.R. at 90a, 102a), and it does not provide any equipment (such as gloves, boots, or hats) (R.R. at 104a–05a). The Catchers usually ride to the farms in Stage Road's van because the Catchers lack drivers' licenses and for other reasons related to the costs of transportation. (R.R. at 90a–91a.) Stage Road keeps track of who works each job by having someone, whether it is a Catcher or the van driver, write down the names of the Catchers who are participating. (R.R. at 117a–18a.) Usually a managing partner

drives a van, but sometimes a Catcher drives a van. (R.R. at 119a.)

Mrs. Snook also testified regarding the information contained in the faxes that Stage Road receives from processors regarding the chicken catching jobs. She explained that the processors, via facsimile, inform Stage Road of the time that the chickens are to be caught and loaded onto the trucks, the locations of the farms, the specific location of the poultry house on the processors' farm, the number of chicken catching teams required, the total number or pounds of chickens to be caught, the number of chickens to be put in each case, and the price-per pound of live poultry caught to be paid. (R.R. at 121a–26a.)

With regard to compensation for services, Mrs. Snook explained that after Stage Road completes a job, the processor faxes information to Stage Road regarding the total weight of chickens that Stage Road caught and the amount paid per pound. (R.R. at 92a–94a.) Stage Road then takes a percentage of the gross amount earned to pay for expenses (such as vans, gas, and insurance), and the remaining amount is divided evenly between the Catchers. (*Id.*) When the Catchers cause damage at the farms, Stage Road pays for the damages out of the percentage paid to Stage Road. (R.R. at 116a–17a.) Mrs. Snook explained the calculation of compensation as follows: a processer may pay $0.008 per live pound caught, and Stage Road may retain $0.003 per pound, leaving the amount of $0.005 per pound to be split evenly between the Catchers. (R.R. at 92a–94a.) The Catchers do not receive hourly wages, do not receive any type of salary, and are not guaranteed set compensation. (R.R. at 94a–95a, 102a.)

Stage Road does not withhold taxes, and it considers the Catchers to be independent contractors (not employees) because Stage Road does not exercise control over them. (R.R. at 95a.) In fact, the Catchers all sign a Joint Venture Agreement, which provides that the purpose of their Joint Venture is to provide chicken catching services to poultry processors on a job-by-job basis, as co-owners for profit, and that they are not employees.[5] (R.R. at 95a–100a.)

As to a Catcher's obligation to perform chicken catching services, Mrs. Snook testified as follows:

Q. Were these catchers permitted to go and come as they pleased?

A. Yes.

Q. You didn't have some specific schedule that required one catcher to come in these certain days, and other catchers come in other days?

A. It's just a day-by-day thing.

Q. Ever have an instance where a catcher might actually show up to a job, but then not perform any work?

A. Yes.

Q. And what would happen in those instances? Would that catcher be punished, reprimanded, disciplined?

A. The catchers holler at him, but you can't—when he don't want to get out of the van, you can't make him.

Q. When you say holler at him, is he being punished, like verbal warnings at all, or is it just giving him a hard time?

A. Well, they—yeah, a hard time. Yes, because you have one less catcher. If you think you need eight for the job, you know, to make

---

5. On cross-examination, Mrs. Snook testified that: "It would make it easier if it was an employee/employer thing. You'd have some more control, but I know I have no control over these catchers, and they know it, and it makes it a little difficult sometimes." (R.R. at 120a.)

it easy on everybody, that's what you like.

Q. Would that person who sat out be compensated?

A. No.

Q. He would just be removed from—

A. Well, he would just ride along. He just wasted all his time.

Q. But nothing would happen to him?

A. No.

Q. He could still call in another day for another—

A. Yes, that happens all the time.

Q. Did you ever reprimand or punish any of the catchers?

A. Not to my knowledge.

(R.R. at 100a–01a.) In addition, the Catchers could also catch chickens for another entity if they wanted to do so, and, in fact, some of the Catchers *did* work for other chicken catching ventures. (R.R. at 104a.)

By decision and order dated November 9, 2010, the Department's Executive Deputy Secretary issued a final decision of the Department, denying both petitions for reassessment. In so doing, the Department made the following findings of fact:

1. Jane Snook is an owner of Stage Road Poultry Catchers (SRPC). (N.T. 66)

2. SRPC is a chicken catching business. (N.T. 66)

3. Processing plants own the chickens and pay farms to feed and raise the birds. (N.T. 67)

4. The processing plants fax a schedule to SRPC with the job specifications. The fax contains the farms, the locations, the times and the chicken specification. (N.T. 72, 91)

5. The catchers are paid by SRPC based on the total weight of live chickens caught. (N.T. 69)

6. SRPC finds catchers through word of mouth and by the number of individuals who call looking for available work. Ms. Snook receives phone calls from the catchers asking about available work 24 hours a day, 7 days a week. (N.T. 74–75)

7. Since catching chickens does not require great skill, no specific training is required or provided. (N.T. 79)

8. The processing plants provide the trucks and cages to transport the chickens to the plants and provide a forklift when necessary for the job. (N.T. 70, 79)

9. There are different types of work to be performed depending on the particular farm. Service[s] can vary between catching chickens, operating a forklift and loading crates into the trucks. (N.T. 77)

10. SRPC utilizes three 15–passenger vans to transport the catchers to the various farms. The vans are known as Snook 1, Snook 2 and Snook 3. The vans have pre-designated pick-up areas for the catchers. (N.T. 67, 76, 79–80, 92)

11. SRPC is paid by the processing plants to catch the chickens at various farms. (N.T. 69)

12. *Different processing plants pay different rates to SRPC. The amount paid to SRPC is an agreed upon price per pound of live chickens negotiated between SRPC and the processing plants. (N.T. 82)*

13. After the job is complete, the processing plant sends SRPC a fax with the total pounds of chickens caught and the amount of money earned. (N.T. 109)

14. *SRPC would set the percentage amount per pound of chickens caught that it would keep from the*

*processing plant's payment and the percentage that would be paid to the check [sic] [chicken] catchers. (N.T. 82–83)*

15. *The catcher's pay is directly affected by the number of catchers that are retained by SRPC to perform work on a specific job. (N.T. 76, 83)*

16. SRPC is responsible to pay for expenses, such as the van, gas and auto insurance. (N.T. 82)

17. If damages are incurred at a farm while catching chickens, SRPC is responsible to pay for the damages. (N.T. 108)

18. *A representative from SRPC records the names of the catchers performing the work to ensure proper payment. (N.T. 107)*

19. The catchers signed a Joint Venture Agreement. The Joint Venture Agreement did not vest any type of decision-making authority to the chicken catchers. (N.T. 84–85)

20. SRPC does not withhold taxes. (N.T. 84)

21. The Joint Venture Agreement did have a penalty provision for catchers who failed to show for a job that they agreed to work.

(Attached to Petitioner's Brief as Exhibit "A" (emphasis added).) Based upon those findings, the Department determined that the Catchers were not free from direction and control in the performance of their work and relied upon a single employer (Stage Road) for their work. As such, the Department concluded that the Catchers were employees of Stage Road and not independent-contractors.

## II. Analysis

On appeal to this Court,[6] Stage Road challenges the Department's determination that the Catchers are employees of Stage Road. It argues that the Department's findings of fact are not supported by substantial evidence in the record. Stage Road also argues that the Department erred as a matter of law in determining that the Catchers were employees and not independent contractors excluded from employment under Section 4($l$)(2)(B) of the Unemployment Compensation Law (Law).[7]

### A. Substantial Evidence

■ First, Stage Road challenges findings of fact numbers 12, 14, 15, and 18, arguing that substantial evidence of record does not exist to support those findings. Substantial evidence is defined as relevant evidence upon which a reasonable mind could base a conclusion. *Johnson v. Unemployment Comp. Bd. of Review*, 94 Pa. Cmwlth. 24, 502 A.2d 738, 740 (1986). In determining whether there is substantial evidence to support the Board's findings, this Court must examine the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence. *Id.* A determination as to whether substantial evidence exists to support a finding of fact can only be made upon examination of the

---

6. This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704. Whether an individual is an employee or an independent contractor is a determination of law subject to our review.

*Applied Measurement Prof'ls., Inc. v. Unemployment Comp. Bd. of Review*, 844 A.2d 632, 635 (Pa.Cmwlth.2004).

7. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 753($l$)(2)(B)

record as a whole. *Taylor v. Unemployment Comp. Bd. of Review,* 474 Pa. 351, 355, 378 A.2d 829, 831 (1977). The Board's findings of fact are conclusive on appeal only so long as the record, taken as a whole, contains substantial evidence to support them. *Penflex, Inc. v. Bryson,* 506 Pa. 274, 286, 485 A.2d 359, 365 (1984). "The fact that [a party] may have produced witnesses who gave a different version of the events, or that [the party] might view the testimony differently than the Board is not grounds for reversal if substantial evidence supports the Board's findings." *Tapco, Inc. v. Unemployment Comp. Bd. of Review,* 168 Pa.Cmwlth. 292, 650 A.2d 1106 (1994). Similarly, even if evidence exists in the record that could support a contrary conclusion, it does not follow that the findings of fact are not supported by substantial evidence. *Johnson v. Unemployment Comp. Bd. of Review,* 95 Pa.Cmwlth. 183, 504 A.2d 989, 990 (1986).

■ As to finding of fact number 12, Stage Road appears to take issue with the portion of the finding that indicates that the "price per pound of live chickens [was] *negotiated* between [Stage Road] and processing plants." (Finding of Fact (F.F.) 12, emphasis added.) It argues that substantial evidence does not exist to support that finding, because the record reveals that the price per pound was determined by the processors in their initial faxes. Stage Road, thus, did not negotiate the price. We agree that the evidence of record, at most, establishes that Stage Road receives faxes from chicken processors setting forth the relevant information for each chicken catching job. The record is undeveloped as to whether Stage Road negotiates or has the ability to negotiate any of the terms of the job. The record is also undeveloped as to whether Stage Road itself may choose to accept or reject a chicken catching job. We do note that the Catchers have no direct interaction with the chicken processors regarding the rate of pay, as Stage Road is the entity that receives the jobs from the chicken processors. Finding of fact number 12, therefore, is not supported by substantial evidence of record.

■ Stage Road also argues that there is not substantial evidence of record to support finding of fact number 14 that Stage Road "set[s] the percentage amount per pound of chickens caught that it would keep from the processing plant's payment and the percentage that would be paid" to the Catchers. (F.F. 14.) Rather, Stage Road contends that the General Agents and the Catchers agree to the per pound price pursuant to the terms of the Joint Venture Agreement. (R.R. at 675a.) Stage Road notes that the Joint Venture Agreement provides that Stage Road will deduct as administrative costs $0.006 per pound for each job where 60,000 live pounds of poultry or less is caught and $0.003 per pound for each job where more than 60,000 pounds of live poultry is caught. (*Id.*) We believe that finding of fact number 14 focuses on which party, as between Stage Road and the Catchers, determines the percentage that would be paid to the Catchers. That the percentages are set forth in the Joint Venture Agreements does not negate the fact that Stage Road determined the percentages contained in the agreements. We note that the percentages were established as far back as the 2003 Joint Venture Agreement (and maintained at the same level in the 2006 Joint Venture Agreement), and that potential new catchers contact Stage Road every day inquiring about chicken catching opportunities. There is no evidence that the Catchers were involved in the initial setting of the percentages contained in the Joint Venture Agreements or

that the Catchers who joined after the Joint Venture Agreements became effective had any ability to negotiate the rate of payment. Substantial evidence, therefore, exists to support finding of fact number 14.[8]

Stage Road also disputes that finding of fact number 15, which provides that "[t]he [C]atchers' pay is directly affected by the number of [C]atchers that are *retained* by [Stage Road] to perform work on a specific job," is supported by substantial evidence. (F.F. 15.) Stage Road mischaracterizes this finding as stating that it sets or establishes the number of Catchers for the joint venture. Stage Road appears to argue that it does not "retain" individuals or establish the number of individuals needed to perform the work, as Stage Road never stops taking calls from individuals looking for work (F.F. 6, R.R. at 2a) and does not know how many Catchers will be participating in a joint venture until the Catchers arrive (R.R. at 87a). Also, because the Catchers could voluntarily decline to participate in a venture if there were too many Catchers willing to participate, the number of Catchers was "set," consequently, by the Catchers and not by Stage Road. (R.R. at 87a, 106a–07a.) First, we begin by noting that the word "retained" is defined as "to keep in pay or in one's service" or to "continue to have, use, recognize, or accept." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) 1938. The definition does not suggest that the word "retain" implies establishing or limiting the number that one may "keep in pay ... or service" or establishing or limiting the number that one may "continue to have, use, recognize, or accept." (*Id.*)

Moreover, although Stage Road interprets finding of fact number 15 as stating that Stage Road "sets" the numbers of Catchers for each job and, therefore, is not supported by substantial evidence, we note that substantial evidence of record would exist to support such a finding. The 2006 Joint Venture Agreement, in Paragraph 3, entitled Participation in a Joint Venture, provides:

> Each of us who desires to participate in a joint venture under this Agreement must have made a commitment to the General Agents to participate in that venture and must actually show up at the venture site and perform catching services. Potential participants in a venture will be selected in the order of their commitments until the number of catchers needed for the venture have committed. If one of us does not show up for a committed-to venture without prior notice of just cause to the General Agents, he or she may participate in the next three ventures to which he or she commits only if an insufficient number of other venturers commit.

(R.R. at 106a–07a.) Therefore, if we were to characterize finding of fact number 15 in the manner suggested by Stage Road, the language of the 2006 Joint Venture Agreement contradicts, at least in part, the testimony of Mrs. Snook that Stage Road does not establish the number of Catchers for each job, and the language would support a finding that Stage Road establishes the number of Catchers for each job because it may select "[C]atchers in the order of their commitments until the number of [C]atchers needed for the venture have committed." (*Id.*)

---

8. In reaching this conclusion, we are mindful that "[in] determining whether there is substantial evidence to support the Board's findings, this Court must examine the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence." *Johnson*, 502 A.2d at 740.

The final finding of fact that Stage Road challenges for lack of substantial evidence is finding of fact number 18, which provides that "a representative from [Stage Road] records the names of the Catchers performing the work to ensure proper payment." (F.F. 18.) In support of its position, Stage Road notes that Ms. Snook testified that anyone in the van, even Catchers, could write down the names of the Catchers who performed services. (R.R. at 117a, 126a.) The testimony of record is as follows:

Q: How do you keep track of who works at a job?

A: Well, somebody writes it down.

Q: So there's—

A: Anybody in the van could write it down. They get a piece of paper and they just write all the names of everybody in the van.

Q: *So someone from Stage Road*—is it the driver who does that?

A: Not always, but the driver can.

Q: *So someone from Stage Road* will write down who's there and who's actually doing work?

A: Right.

(R.R. at 117a–18a, emphasis added.) Evidence of record, therefore, exists to support finding of fact number 18 that a representative from Stage Road records the names of the Catchers for purposes of payment, even if the representative may do so by requesting the Catchers to write their own names.

## B. Error of Law

◼ Next, we will address Stage Road's argument that the Department erred as a matter of law in determining that the Catchers were employees and not independent contractors excluded from employment under Section 4($l$)(2)(B) of the Law. Whether an individual is an employee or independent contractor under Section 4($l$)(2)(B) of the Law is a question of law, subject to this Court's review. *Applied Measurement Prof'ls., Inc. v. Unemployment Comp. Bd. of Review*, 844 A.2d 632, 635 (Pa.Cmwlth.2004).

The purpose of Section 4($l$)(2)(B) of the Law "is to exclude independent contractors from [unemployment compensation] coverage." *Beacon Flag Car Co., Inc. v. Unemployment Comp. Bd. of Review*, 910 A.2d 103, 107 (Pa.Cmwlth.2006). Section 4($l$)(2)(B) of the Law provides:

Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that—(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.

◼ The courts have interpreted the language of Section 4($l$)(2)(B) of the Law as establishing a two-prong test to determine if an individual is engaged in "self-employment" and, therefore, ineligible for unemployment compensation benefits. *Kuhn v. Unemployment Comp. Bd. of Review*, 61 Pa.Cmwlth. 176, 432 A.2d 1156, 1158 (1981). Under the two-prong test, "where the [individual]'s services are performed free of the employer's control *and* the claimant's services are the type performed in an independent trade or business, the claimant is not in an employment relationship." *CE Credits OnLine v. Unemployment Comp. Bd. of Review*, 946 A.2d 1162, 1167 (Pa.Cmwlth.2008) (emphasis in original), *appeal denied*, 601 Pa. 689, 971 A.2d 493 (2009). The putative employer asserting that the individual is not sub-

ject to coverage for reason of Section 4(*l*)(2)(B) of the Law bears the burden to prove that the individual is not in an employment relationship. *Id.* This provision assumes that the individual was an employee, but this presumption may be overcome if the putative employer proves that the individual was free from control and direction in the performance of his service and that he was customarily engaged in an independent trade or business. *Beacon Flag Car*, 910 A.2d at 107. Unless both of these requirements are met, it is presumed that the individual was an employee. *Id.* at 108.

■ As to the first prong—whether an individual was free from control and direction—courts consider whether the putative employer exercised "control" as to the work to be done and the manner in which the work is to be performed. *Id.* The existence of an independent contractor agreement is not dispositive, although it is a significant factor to be considered. *Glatfelter Barber Shop v. Unemployment Comp. Bd. of Review*, 957 A.2d 786, 798 (Pa.Cmwlth.), *appeal denied*, 599 Pa. 712, 962 A.2d 1198 (2008). This Court has identified a number of factors relevant to whether an individual is free of "control" for purposes of Section 4(*l*)(2)(B) of the Law. *CE Credits OnLine*, 946 A.2d at 1168. These factors include: "whether there is a fixed rate of remuneration; whether taxes are withheld from the [individual]'s pay; whether the employer supplies the tools necessary to carry out the services; whether the employer provides on-the-job training; and whether the employer holds regular meetings that the [individual] was expected to attend." *Id.* Our Court also has considered whether periodic progress reports were to be made. *Monroe G. Koggan Assocs., Inc. v. Unemployment Comp. Bd. of Review*, 80 Pa.Cmwlth. 626, 472 A.2d 277, 279 (1984).

In *Beacon Flag Car*, a decision in which we concluded that a driver for a flag car dispatch service was an independent contractor, we also considered whether the employer determined the time, place and destination of the trip; whether the employer determined the route for the drivers or required drivers to report their progress throughout the route; whether the employer supervised the drivers; whether drivers were free to make their own arrangements with clients as long as appropriate compensation was received by the employer; whether drivers were paid on an hourly basis or per job basis; and most importantly, whether drivers were free to refuse any client or trip without repercussions. *Beacon Flag Car*, 910 A.2d at 108.

■ While courts have considered a variety of factors, no one factor is dispositive of the ultimate question of whether the employer "controls" the work to be done and the manner in which it is done. *CE Credits OnLine*, 946 A.2d at 1168–69. Moreover, courts recognize a difference between control of a work product versus control over the time, place, and manner of performance, the former of which suggest and independent contractor relationship and the latter of which suggests an employment relationship. *Id.* at 1169. As we explained in *CE Credits OnLine:*

"Control of the result only and not of the means of accomplishment" [does] not transform an independent contractor relationship into an employer-employee relationship. Every job, whether performed by an employee or by an independent contractor, has parameters and expectations. "Control" for purposes of Section 4(*l*)(2)(B) of the Law is not a matter of approving or directing the final work product so much as it is a

matter of controlling the means of its accomplishment.

*Id.* (citation omitted).

In the instant case, although not dispositive, we begin by noting that the Joint Venture Agreements contain the following language expressly providing that the Catchers are not employees:

> 3. Not Employees. All services by any of us to or on behalf of the joint venture shall be performed as a joint venture and not as an employee of the joint venture. No joint venturer shall be entitled to any salary, wages, or other compensation from the joint venture, but shall look solely to a share of net profits for remuneration.

(R.R. at 675a, 677a.)

There are numerous factors to indicate that the Catchers were not employees of Stage Road. First, the Catchers did not receive a fixed rate of remuneration, but rather the Joint Venture determined compensation on a job-by-job basis depending upon the number of pounds of chickens caught and the number of Catchers providing chicken catching services for the particular job. *See Beacon Flag Car,* 910 A.2d at 108; *Pavalonis v. Unemployment Comp. Bd. of Review,* 57 Pa.Cmwlth. 289, 426 A.2d 215, 217 (1981). Second, the Joint Venture did not withhold taxes from the Catchers' compensation. *See Krum v. Unemployment Comp. Bd. of Review,* 689 A.2d 330, 332 (Pa.Cmwlth.1997). Third, the Joint Venture did not provide tools or equipment necessary to provide chicken catching services. Required tools or equipment, such as trucks, cages, and forklifts, were provided by the processors, and the Catchers supplied themselves with hats, gloves, or boots, if they desired such items. *See CE Credits OnLine,* 946 A.2d at 1168; *Beacon Flag Car,* 910 A.2d at 105. Fourth, the Joint Venture did not provide training or instruction on how to catch chickens. *See CE Credits OnLine,* 946 A.2d at 1168; *Beacon Flag Car,* 910 A.2d at 105. Fifth, although the Joint Venture accepted jobs from processors, the time, place and location of each job was determined by the processors, not by the Joint Venture or the Catchers, and, therefore, the Joint Venture did not dictate those terms of the job. *See Beacon Flag Car,* 910 A.2d at 108 (holding that fact that client, not employer, controlled time, manner, and location of services to be performed weighed in favor of independent contractor status). Sixth, the Joint Venture did not supervise the group or dictate the manner in which the work must be completed; [9] rather the Catchers worked together as a group to divide tasks and complete each job without supervision to accomplish the goal of loading live chickens. *See York Gazette Co. v. Bureau of Employment Securities, Dep't of Labor and Indus.,* 28 Pa.Cmwlth. 410, 368 A.2d 1314, 1315 (1977) (holding that putative employer's control over result but not manner in which work was performed is factor that weighs in favor of independent contractor status). It is clear from the record that the Joint Venture did not exercise control over the manner in which the Catchers divided the work to be accomplished or performed the task of catching the chickens and loading them into cages and/or onto trucks. The Joint Venture was interested in the end result only—the catching and loading of live chickens. Finally, and of great significance, it appears from the record that the Catchers were

---

9. As discussed above, the processors (not the Joint Venture) dictated the manner in which the work must be completed by establishing the time, location, per pound price, size and/or number of chickens to be caught, and number of chickens to be loaded per cage for each chicken catching job. (R.R. at 121a–26a, 147a–55a.)

free to decline or accept any chicken catching job that was made available by the Joint Venture without repercussions. *See Danielle Viktor, Ltd. v. Dep't of Labor and Indus., Bureau of Employer Tax Operations,* 586 Pa. 196, 229, 892 A.2d 781, 801 (2006) (holding that because drivers provided services to company on job-by-job basis and each assignment was taken or rejected strictly at drivers' prerogative, drivers were independent contractors "[g]iven the fluidity of these arrangements").[10] Moreover, we note that there is no evidence to suggest that the Joint Venture held regular meetings that the Catchers were expected to attend or required the Catchers to report their progress to the Joint Venture. Given these circumstances, we conclude that the Department erred in determining that the Catchers were not free from direction and control in the performance of their work.

We also agree with the Joint Venture that the Department, in reaching its conclusion in error, gave "inordinate legal weight, in fact dispositive weight," to only select facts or portions of the Joint Venture Agreements, such as Paragraph 3 of the 2006 Joint Venture Agreement, without examining the factors of "actual" control. (Petitioner's Brief at 19.) The Department appeared to misinterpret the provisions of Paragraph 3 as imposing a penalty or repercussion for not accepting a job, which clearly the provision does not do. The Department also appears to place excessive weight on the use of the Joint Venture vans to transport the Catchers, although use of the vans was not required and transportation was provided for convenience because many of the Catchers lacked driver's licenses and due to the cost of transportation for the Catchers. (R.R. at 86a–88a.)

▮▮▮▮▮▮ As to the second prong of the test under Section 4(*l*)(2)(B) of the Law—whether the claimant is customarily engaged in an independently established trade, occupation, profession, or business—courts consider "whether the individual was capable of performing the activities in question [for] anyone who wished to avail themselves of the services and whether the nature of the business compelled the individual to look to only a single employer for the continuation of such services." *Venango Newspapers v. Unemployment Comp. Bd. of Review,* 158 Pa.Cmwlth. 379, 631 A.2d 1384, 1388 (1993). Where the employee is free to accept or reject an assignment, the individual generally is not considered to look to a single employer for the continuation of such services. *Danielle Viktor,* 586 Pa. at 229, 892 A.2d at 801.

---

**10.** Although the Department made no finding of fact regarding whether the Catchers are free to decline or accept any chicken catching job, there are no facts of record evidencing that Catchers may not decline or must accept any particular chicken catching job. Furthermore, the record is replete with testimony from Mrs. Snook that the Catchers themselves determined whether they wanted to participate in a chicken catching job and that there were no repercussions for not participating in a job. (R.R. at 86a–88a.) The only reference to any repercussion is contained in Paragraph 3 of the 2006 Joint Venture Agreement, which provides that if a Catcher *agreed to participate in a venture but failed to show· up* without notice and good cause, then the Catcher may take part in the next three ventures to which he commits *only* if the number of Catchers is insufficient. (R.R. at 106a–07a.) Mrs. Snook was not asked any questions about whether the Joint Venture ever imposed the penalty of Paragraph 3 on Catchers, and she provided no testimony about the Joint Venture ever having done so. Regardless, the penalty set forth in Paragraph 3 does not limit a Catcher's ability to accept or reject a job; it only provides a penalty for accepting a job and then failing to show without prior notice and good cause. (*Id.*) Furthermore, Mrs. Snook testified that she had never reprimanded or punished any of the Catchers. (R.R. at 101a.)

At the outset, we note that the Joint Venture Agreements provide that "[m]embership in this joint venture shall not preclude any of us from poultry catching with persons other than the members of this joint venture," although the 2006 Joint Venture Agreement adds the language "so long as doing so does not interfere with our participation in the ventures of this association." (R.R. at 675a, 677a.) Additionally, Mrs. Snook specifically testified that the Catchers were free to catch chickens for another joint venture if they wanted to do so. (R.R. at 104a.) In fact, Mrs. Snook testified that some of the Catchers *did* work for other chicken catching ventures. (*Id.*) We also note that the Department did not make any finding of fact that suggested that the Catchers were not free to accept or reject an assignment, and Mrs. Snook provided uncontradicted testimony that the Catchers themselves decided whether they would provide chicken catching services on a job-by-job basis, often simply by showing up to perform the work. (R.R. at 86a–88a, R.R. at 100a–01a.) Based upon these facts, it would appear that the Joint Venture met the requirements for independent contractor under the second prong of the test for Section 4($l$)(2)(B) of the Law.

█ The Department, however, determined that the Catchers were not engaged in an independent trade, business, or occupation because "there was no persuasive evidence in the record to suggest that the catchers *did* perform services for other businesses, or that [C]atchers did not solely look to [the Joint Venture] for continued employment." (R.R. at 9a (emphasis added).) Although Tax Services urges the Court to conclude that the Joint Venture failed to meet the second prong of Section 4($l$)(2)(B) because there is no evidence that the Catchers actually performed services for other joint ventures, we note that there is no evidence of record to suggest that they do not perform services for other catchers. Regardless, to conclude that the Joint Venture must be deemed an employer (as opposed to an independent contractor) based upon the relationship of the Catchers with third parties is problematic and would result in an unworkable framework. If we were to add such a requirement to our analysis, the status of a putative employer could be in a continual state of flux based upon whether or not at any given time (all, some, or one of) the *individuals* who perform work for the putative employer choose (or choose not) to perform such work for *third parties.* · Under these circumstances, the determination would have nothing to do with the activities of the putative employer and its relationship with the individuals, but rather the determination of employer or independent contractor status would be dependent on the activities of the *individuals* and *third parties.* Such a framework would be untenable and require fact finding as to a relationship between the *individuals* who perform work for the putative employer and *third parties* to determine the status of the *putative employer.* Neither the Department nor Tax Services cites any statutory provision or case law in support of this position, and, for the reasons discussed above, we reject this argument.[11]

### Conclusion

Accordingly, the order of the Department is reversed.

---

11. We also reject Tax Service's argument that the Catchers are not engaged in a "trade, occupation, profession or business." Section 4($l$)(2)(B) of the Law. We agree with the Joint Venture that poultry catching is a business, trade, or occupation upon which processors and growers depend to perform critical roles in the poultry industry. (Petitioner's reply brief at p. 10.) Although poultry catching may not require advanced skill sets, this does not preclude a finding of it being a trade, occupation, or business.

## ORDER

AND NOW, this 29th day of December, 2011, the order of the Department of Labor and Industry, dated November 9, 2010, is hereby REVERSED.