**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| DONALD LOWMAN, | : | No. 41 EAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of Commonwealth Court entered on 01/24/2018 at No. 686 CD 2016 reversing and remanding the Order entered on 04/22/2016 by the Unemployment Compensation Board of Review at Nos. B-15-09-H-3978 and B-586362-A |
| v. | : | |
| | : | |
| | : | |
| | : | |
| UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, | : | |
| | : | |
| Appellant | : | ARGUED: September 11, 2019 |

**OPINION**

**JUSTICE DONOHUE**                                    **DECIDED:  July 24, 2020**

In this case of first impression, the Court is asked to decide the appropriate test to determine whether a claimant who is otherwise entitled to receive unemployment compensation benefits due to a separation from employment becomes ineligible for those benefits as a result of being self-employed pursuant to Section 402(h) of the Unemployment Compensation Law (the "Act"),[1] 43 P.S. §§ 751–919.10, the self-employment exclusion.  We hold that Section 4(l)((2)(B), 43 P.S. §753(l)(2)(B), contains the appropriate test for determining whether or not an individual is in self-employment.  If an individual is not in "self-employment," then he remains eligible for benefits.  Applying

---

[1]  Act of December 5, 1936, Second Ex. Sess., P.L. 2897*.*

that test to the facts of this case, we affirm the ruling of the Commonwealth Court that the claimant was not self-employed.

## I. INTRODUCTION

The Act does not define the term "self-employment." Yet, the determination that an individual is self-employed is highly consequential: the individual who is otherwise eligible for benefits due to separation from employment receives no benefits for any week of self-employment. 43 P.S. § 802(h). This is in contrast to the same individual who is found, instead, to be employed while receiving benefits. In such a case, the individual remains eligible to receive benefits with an offset for the remuneration received from the post-separation provision of personal services. *See* 43 P.S. § 804(d)(1).

As will be described in detail below, claimant Donald Lowman ("Lowman") began driving for Uber Technologies, Inc. ("Uber")[2] shortly after his separation from employment. We anticipate that the resort to this opportunity to supplement unemployment compensation benefits will routinely arise given the ease with which an individual can become a driver-for-hire under the auspices of an entity like Uber.

The Act was enacted in 1936 because "the public good and the general welfare of the citizens of this Commonwealth require the exercise of the police powers of the Commonwealth in the enactment of this act for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no

---

[2]  Technically, Lowman contracted with Raiser, LLC, a wholly-owned subsidiary of Uber that operates in Pennsylvania. While Uber Technologies, Inc., is not a party to the case, Raiser is referred to as "Uber" for ease of understanding.

fault of their own." 43 P.S. § 752. The General Assembly amended the Act in 1959 to include the self-employment exclusion,[3] which provides as follows:

An employe shall be ineligible for compensation for any week …

> (h) In which he is engaged in self-employment: Provided, however, That an employe who is able and available for full-time work shall be deemed not engaged in self-employment by reason of continued participation without substantial change during a period of unemployment in any activity including farming operations undertaken while customarily employed by an employer in full-time work whether or not such work is in "employment" as defined in this act and continued subsequent to separation from such work when such activity is not engaged in as a primary source of livelihood. Net earnings received by the employe with respect to such activity shall be deemed remuneration paid or payable with respect to such period as shall be determined by rules and regulations of the department.

43 P.S. § 802(h).

Although the Act does not define the term "self-employment," it does define "employe" and "employment":

> (i) **"Employe"** means every individual, whether male, female, citizen, alien or minor, who is performing or subsequent to January first, one thousand nine hundred thirty-six, has performed services for an employer in an employment subject to this act.

> (l)(1) **"Employment"** means all personal service performed for remuneration by an individual under any contract of hire, express or implied, written or oral, including service in interstate commerce, and service as an officer of a corporation.

43 P.S. §§ 753(i), (l)(1). Within this section of the Act, the General Assembly provides an additional definition of the term "employment" in Section 753(l)(2)(B):

## § 753. Definitions

---

[3]  Act of December 5, 1936, Second Ex. Sess., P.L. 2897, *as amended*, 1959, Dec. 17, P.L. 1893, No. 693, §§ 8, 9, 10; 43 P.S. § 802(h).

\*　　\*　　\*

(2) The term "Employment" shall include an individual's entire service performed within or both within and without this Commonwealth, if--

(A) The service is localized within this Commonwealth, or

(B) The service is not localized in any state but some of the service is performed within this Commonwealth and (a) the base for operations or place from which such service is directed or controlled is in this Commonwealth, or (b) the base for operations or place from which such service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this Commonwealth. Service shall be deemed to be localized within this Commonwealth if--(a) the service is performed entirely within this Commonwealth, or (b) the service is performed both within and without this Commonwealth, but the service performed without this Commonwealth is incidental to the individual's service within this Commonwealth as for example where it is temporary or transitory in nature or consists of isolated transactions. Services performed without this Commonwealth shall not be included within the term "Employment" if contributions are required and paid with respect to such services under an unemployment compensation law of any other state.

**Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that-- (a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.**

(C) The term "Employment" shall include an individual's services wherever performed within the United States, the Virgin Islands or Canada if--(i) such service is not covered under the unemployment compensation law of any other state, the Virgin Islands or Canada, and (ii) the place from which the service is directed or controlled is in this Commonwealth.

43 P.S. § 753(l)(2)(B) (emphasis added).

At issue in this case is the highlighted portion of Section 753(l)(2)(B). Subpart (a) will be referred to as the "control factor" and subpart (b) as the "independence factor."

## II. BACKGROUND

Lowman was separated from his job as a behavioral health specialist with Resources for Human Development. He filed a claim for unemployment compensation benefits. While his application was pending, on July 1, 2015, Lowman electronically signed a Software License and Online Services Agreement ("Agreement") with Uber, a transportation network company.[4] N.T. (Referee Hearing), 10/29/2015, at 22. The Agreement granted Lowman a "non-transferrable license to install and use" Uber's mobile lead generation application ("Driver App"[5]) for the provision of rides to passengers in Philadelphia ("Transportation Services"). N.T. (Referee Hearing), 10/29/2015, Uber Exhibit 1 (Agreement, ¶¶ 1.6, 1.12, 2.62, 5.1). In return, Lowman agreed to pay Uber "a

---

[4] A "transportation network company" is one that engages in a "transportation network service," which is defined statutorily as a service that meets all of the following requirements:

> (i) Matches a passenger and transportation network company driver using a digital network in advance of a prearranged ride.

> (ii) Is characterized by a transportation network company driver offering or providing a prearranged ride to a passenger.

> (iii) Originates within the city [of Philadelphia].

> (iv) Is rendered on an exclusive basis.

53 Pa.C.S. § 57A01.

[5] The Agreement defines "Driver App" as "the mobile application provided by Company that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified from time to time." Agreement, ¶ 1.6.

service fee on a per … [ride] basis calculated as a percentage of the Fare … as provided or otherwise made available by [Uber] …."  Agreement, ¶ 4.4.

Uber provided Lowman with "software, websites, payment services … and related support services systems" ("Uber Services").  Agreement, ¶ 1.13; N.T. (Referee Hearing), 10/29/2015, at 9; Board Decision, 4/22/2016, ¶ 3.  As part of its Uber Services, Uber offered Lowman guidance on how to earn the most money and provide the best driver-for-hire service.  N.T. (Referee Hearing), 10/29/2015, at 16, 24–25, 26, 38, Lowman Exhibits 6–9, 12, 15, 17 (Uber emails to Lowman with suggestions); Board Decision, 4/22/2016, ¶ 8.  Lowman began using the Driver App on July 1, 2015, and was still driving as of October 28, 2015, the night before the hearing in this case.  N.T. (Referee Hearing), 10/29/2015, at 5; Board Decision, 4/22/2016, ¶ 16.  During that four-month period, Lowman worked "[p]art-time hours as were available" and received "between $15 and $22 an hour" depending on the number of trips.  N.T. (Referee Hearing), 10/29/2015, at 5.

Lowman used his own vehicle and cell phone to provide transportation services, but Uber required that the vehicle and cell phone meet its criteria to be authorized for use.  Agreement, ¶¶ 1.16, 1.17, 2.6.23.1–3.3; N.T. (Referee Hearing), 10/29/2015, at 8, 10, 13; Board Decision, 4/22/2016, ¶¶ 9, 10.  Lowman had to use the Driver App "at least once a month to maintain an active Driver profile;" otherwise, Uber could deactivate Lowman's access to the Driver App.  Agreement, ¶ 2.1.  As a driver, Lowman could "not contact any [passenger] for any reason except for the purposes of fulfilling Transportation Services." *Id.* ¶ 2.2; N.T. (Referee Hearing), 10/29/2015, at 28.  He was "solely responsible for determining the most effective, efficient and safe manner to perform each instance of

Transportation Services" and for providing "all necessary equipment, tools and other materials, at [his] own expense, necessary to perform Transportation Services." Agreement, ¶ 2.2; N.T. (Referee Hearing), 10/29/2015, at 11, 37, 38.

Lowman had "the sole responsibility for any obligations or liabilities to [passengers] or third parties that [arose] from [his] provision of Transportation Services[,]" including maintaining adequate insurance. Agreement, ¶ 2.3; Board Decision, 4/22/2016, ¶ 4. The Agreement, provided that Uber "does not, and shall not be deemed to, direct or control [Lowman] generally or in [his] performance under this Agreement." Agreement, ¶ 2.4. Lowman retained "the sole right to determine when and for how long [he] will utilize the Driver App or the Uber Services," and he exercised that right. *Id.*; N.T. (Referee Hearing), 10/29/2015, at 23. He also retained the option to accept, decline, ignore, or cancel a request for Transportation Services. Agreement, ¶ 2.4; N.T. (Referee Hearing), 10/29/2015, at 8, 10, 26, 36; Board Decision, 4/22/2016, ¶ 7. However, failure to maintain an adequate acceptance rating could negatively impact Lowman's access to the Driver App. Agreement, ¶¶ 2.4, 3.1, 12.2.

Uber supplied Lowman with a placard bearing Uber's signage, which Pennsylvania law required to be displayed on Lowman's vehicle; Uber did not otherwise require Lowman to display its name, logo, or colors on his vehicle or to wear a uniform or other clothing displaying Uber's name, logo, or colors. 53 Pa.C.S. § 57A10(a) (Display of Transportation Network Companies Distinctive Signage); Agreement,¶ 2.4; N.T. (Referee Hearing), 10/29/2015, at 9, 11, 12; Board Decision, 4/22/2016, ¶¶ 5, 6. Although Lowman could "provide services or otherwise engage in other business or employment activities[,]" such as using a competitor's software application to provide driver-for-hire services,

Lowman could not independently solicit rides. Agreement, ¶ 2.4; N.T. (Referee Hearing), 10/29/2015, at 10, 22, 28, 39–40; Board Decision, 4/22/2016, ¶ 14. At its sole discretion, Uber could restrict or deactivate Lowman's use of the Driver App if Lowman violated the Agreement, disparaged Uber, or caused harm to Uber through his acts or omissions, "or for any other reason at the reasonable discretion of [Uber]." Agreement, ¶ 2.4; N.T. (Referee Hearing), 10/29/2015, at 19–20, 23.

Uber collected passenger ratings of Lowman and required him to maintain "an average rating by [passengers] that exceeds the minimum average rating" established by Uber "[i]n order to continue to receive access to the Driver App and the Uber Services[.]" Agreement,¶ 2.5.2; N.T. (Referee Hearing), 10/29/2015, at 25, 27, 30–32. Uber titled Lowman as "a VIP driver" based on passenger ratings. N.T. (Referee Hearing), 10/29/2015, at 32. If Lowman did not wish to accept requests for Transportation Services for a period of time, he had to log off of the Driver App. Agreement, ¶ 2.52. Lowman could not delegate or subcontract requests for Transportation Services that he accepted. Agreement, ¶¶ 2.62, 5.2. While Lowman was logged into the Driver App, including when providing transportation services, Uber, through geolocation technology, tracked his location. Agreement, ¶ 2.7. Uber "reserve[d] the right, at any time in [Uber's] sole discretion, to deactivate or otherwise restrict [Lowman] from using the Driver App … if [he] fails to meet the requirements set forth in this Agreement." Agreement, ¶ 3.1. Uber ran a background check on Lowman and required him to have automobile liability insurance, a valid driver's license, a properly registered vehicle, and workers' compensation insurance. Agreement, ¶¶ 3.1, 3.2, 8.1–8.4; N.T. (Referee Hearing), 10/29/2015, at 10, 12–13, 14; Board Decision, 4/22/2016, ¶ 4.

Lowman's passengers paid Uber a flexible rate determined by Uber; Uber paid Lowman for each ride he accepted, without deducting taxes, by weekly direct deposit. Agreement, ¶¶ 4.1–4.8; N.T. (Referee Hearing), 10/29/2015, at 10, 11, 17–18, 32, 38, 41, Lowman Exhibit 2, 3–5 (Service Fee Schedule, Payment Statements); Board Decision, 4/22/2016, ¶ 11. Uber reimbursed Lowman for tolls, but not for vehicle maintenance or fuel, and would provide a 1099 tax form at the end of the year. Agreement, ¶ 4.1; N.T. (Referee Hearing), 10/29/2015, at 11, 33, 34; Board Decision, 4/22/2016, ¶ 13. While either party could terminate the Agreement, without cause, Uber could terminate the Agreement or deactivate Lowman's access to the Driver App and Uber Services "immediately, without notice, … in the event [Lowman] no longer [qualified], under applicable law or the standards and policies of [Uber] … to provide Transportation Services or to operate the [v]ehicle, or as otherwise set forth in this Agreement." Agreement, ¶ 12.2. Although the Agreement identifies the parties relationship as "solely that of independent contractors," which Lowman acknowledged, he considered himself an employee of Uber. Agreement, ¶ 13.1; N.T. (Referee Hearing), 10/29/2015, at 22, 35–36.

Lowman drove for Uber most days and earned approximately $350.00 per week. Board Decision, 4/22/2016, ¶ 12; N.T. (Referee Hearing), 10/29/2015, Lowman Exhibits 3–4 (Payment Statements). Lowman was not required to attend meetings, and Uber did not provide him with business cards or advertise his personal driver-for-hire services. N.T. (Referee Hearing), 10/29/2015, at 11; Board Decision, 4/22/2016, ¶ 15. Lowman's driving history was "frequent and prolonged, rather than occasional and limited"; there was no evidence that Lowman was working on an as-needed basis or that he was "just

trying to earn some extra money on the side" or "to earn part-time income as he searches for re-employment in his career field." *Id.* at 3–4.

### III. PROCEDURAL HISTORY

As required under the Act, Lowman reported his Uber earnings to the Duquesne Unemployment Compensation Service Center ("UC Service Center"). The UC Service Center issued a Notice of Determination on August 17, 2015, finding Lowman's Uber driving rendered him ineligible for continued benefits under Section 802(h) because he was self-employed. Lowman appealed and appeared with counsel at a referee hearing on October 29, 2015. Uber had been given notice of the proceeding as a putative employer[6] and participated in the hearing, as did a representative from the Department of Labor and Industry ("Department").[7] The referee affirmed the UC Service Center determination, finding that Lowman was self-employed pursuant to the test in Section 753(l)(2)(B), and, as such, ineligible for benefits.

Lowman appealed to the Unemployment Compensation Board of Review ("Board"). Applying Section 753(l)(2)(B), the Board affirmed the referee's decision on February 12, 2016, declaring Lowman ineligible for continued benefits because he

---

[6] Generally speaking, a claimant seeks unemployment compensation benefits in relation to the employer from whose employment he was separated through no fault of his own, *i.e.*, the separating employer. Where that claimant participates in a post-separation work relationship from which he reports earnings to the Department, the Department treats the new entity as a putative employer for the purposes of establishing the claimant's eligibility for benefits. *Training Associates Corp. v. UCBR*, 101 A.3d 1225, 1232 (Pa. Commw. 2014).

[7] Because the Department initiated the proceedings that resulted in a denial of Lowman's benefits, it carried the burden of proof. *Training Associates*, 101 A.3d at 1234.

became self-employed when he earned money by providing driver-for-hire services.[8] Lowman filed a petition for reconsideration, which the Board granted. In a new decision, the Board ruled again that Lowman was self-employed and, as such, ineligible for benefits under Section 802(h). Board Decision, 4/22/2016, at 4.

Lowman filed a petition for review in the Commonwealth Court in April 2016. In a published en banc decision, the Commonwealth Court reversed, concluding that Lowman was not self-employed, and therefore he was eligible for benefits.[9] *Lowman v. UCBR*, 178 A.3d 896 (Pa. Commw. 2018) (en banc). Writing for the Commonwealth Court, President Judge Mary Hannah Leavitt faulted the Board's consideration of Lowman's work relationship with Uber because Lowman did not seek benefits from Uber as a separating employer. *Lowman*, 178 A.3d at 901; N.T., 10/29/2015, at 3. According to the Commonwealth Court, Lowman's employment relationship vis-à-vis Uber "is not an issue … to consider," because doing so reduces the issue to an "either/or" situation: Lowman is either self-employed, and therefore ineligible for benefits, or an employee of Uber. *Lowman*, 178 A.3d at 901 (citing *Training Associates Corp. v. UCBR*, 101 A.3d 1225, 1232 (Pa. Commw. 2014)).

Rather than examine Lowman's work relationship with Uber to determine his employment status, the Commonwealth Court elected to examine only whether Lowman

---

[8] The Board is the ultimate finder of fact; questions regarding the weight of evidence and witness credibility are solely within its province. *Morgan v. UCBR*, 108 A.3d 181, 188 (Pa. Commw. 2015).

[9] The Commonwealth Court's scope of review is limited to determining whether necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated. *Pileggi v. UCBR*, 212 A.3d 1149, 1151 n.5 (Pa. Commw. 2019).

took "a positive step toward establishing an independent business."[10] *Lowman*, 178 A.3d at 902. The Commonwealth Court justified its "positive steps" approach by analogy to two of its cases that applied Section 753(l)(2)(B) in the context of determining ineligibility for benefits under Section 802(h): *Buchanan v. UCBR*, 581 A.2d 1005 (Pa. Commw. 1990), and *Teets v. UCBR*, 615 A.2d 987 (Pa. Commw. 1992). In *Buchanan*, the claimant invested approximately $2,000 in jewelry crafting materials after separation from his employer. He used those materials to make jewelry, which he later sold at weekly flea markets and a fair. The Board denied benefits on the grounds that the claimant "was self-employed under Section 802(h) of the [UC] Law[.]" *Buchanan*, 581 A.2d at 1007. In a split decision, the Commonwealth Court reversed, holding that the claimant did not take "a positive step toward establishing an independent business." *Id.* at 1008 (citation omitted). Specifically, the court challenged the Board's finding as to the independence factor of Section 753(l)(2)(B) because the claimant "did not form a corporation … advertise, list a telephone number for his alleged business, nor did he obtain insurance"; his activity "was one on the side to make some extra money." *Id.* at 1009.

In *Teets*, the claimant was collecting unemployment benefits when she signed an Agreement, to be a distributor for Nu Skin Products, "a pyramidal sales program." *Teets*, 615 A.2d at 988. She spent $250 on a sales kit, and she made $6 in commissions.

---

[10] The Commonwealth Court also addressed whether Lowman's Uber driving constituted something more than a "sideline activity." *Lowman*, 178 A.3d at 902. The Act's sideline activity exception is part of the self-employment exclusion and is applicable when the self-employment activity precedes valid separation from full-time work; it continues without substantial change after separation; the claimant remains available for full-time work after separation; and the self-employment activity is not the primary source of the claimant's livelihood. 43 P.S. § 802(h). Because Lowman did not provide driving services while he was employed by Resources for Human Development, the Commonwealth Court recognized that this is not a sideline activity case. *Lowman*, 178 A.3d at 902 n.9.

Apparently relying on the de minimus amount of earnings and not on the Section 753(l)(2)(B) factors, the Commonwealth Court opined, "[T]he fact that an activity which may generate a limited amount of income is not undertaken while a claimant is still employed does not automatically make it 'self-employment.'" *Id.* at 989. Relying on the *Buchanan* rationale of excluding activities engaged in "to make some extra money," the Commonwealth Court concluded the claimant "was not engaged in self-employment so as to disqualify her from receiving benefits." *Id.* at 990.

Using its "positive steps" approach, the Commonwealth Court rejected the Board's ruling that Lowman was self-employed because the Department did not demonstrate that Lowman's Uber driving was an independent business venture. *Lowman*, 178 A.3d at 903. Specifically, the Commonwealth Court observed that Lowman did not take any "positive steps" to hold himself out as a commercial driver or prepare for a driver-for-hire business. *Id.* at 902–903. Having reached this conclusion, President Judge Leavitt announced that "[s]hort-term work, including self-employment, in which a claimant engages after losing a job, does not render the claimant ineligible for unemployment compensation benefits under Section 802(h)[.]" *Id.* at 902 (paraphrasing *Silver v. UCBR*, 34 A.3d 893, 898 (Pa. Commw. 2011) ("[T]he fact that an unemployed person . . . accept[s] an occasional offer of work is simply not enough to demonstrate that said individual is customarily engaged in an independently established trade, occupation, profession or business.")).

In a concurring and dissenting opinion, Judge McCullough agreed that Lowman was not self-employed but she disagreed with the Commonwealth Court Majority's use of the "positive steps" test and its exclusion of Lowman's work relationship with Uber from its analysis because of the consequence of creating an "either/or" dichotomy. *Lowman*,

178 A.3d at 904 (McCullough, J., concurring and dissenting). Judge McCullough observed that existing precedent addresses scenarios where the claimant began working with a third party, and its consequences, citing *Training Associates Corp. v. UCBR*, 101 A.3d 1225, 1232 (Pa. Commw. 2014). In *Training Associates*, the claimant was receiving benefits following her separation from Accolade, Inc. She worked four days with Training Associates and reported that income. The Board found that the claimant "was not customarily engaged in an independently established trade or business," and therefore not self-employed. *Id.* at 1228. On appeal, the Commonwealth Court affirmed, explaining that finding a claimant is not an independent contractor does not mean the person is necessarily an employee of a third party. *Id.* at 1233 (citing *Silver*, 34 A.3d 893). The *Training Associates* court disavowed an "either/or approach," recognizing the evidentiary value of the putative employer's participation. "[T]here must be a mechanism to determine, in the first instance, whether a claimant who reports wages received from a short-term, temporary assignment … is engaged in self-employment for UC purposes." *Id.*

Judge McCullough criticized the Commonwealth Court Majority's "positive steps" approach as contrary to jurisprudence regarding self-employment: "Indeed, as this [c]ourt has routinely held, the two-prong test of Section 753(l)(2)(B) is the same regardless of whether it is an 'independent contractor' case involving the separating employer, or [as here] a 'self-employment' case involving work undertaken with a new entity following separation from an employer." *Lowman*, 178 A.3d at 905 (citing *Silver*, 34 A.3d at 896; *Venango Newspapers v. UCBR*, 631 A.2d 1384, 1387 (Pa. Commw. 1993); *Buchanan*, 581 A.2d at 1007–08; *Laswick v. UCBR*, 310 A.2d 705, 709 (Pa. Commw. 1973)). Judge

McCullough reasoned that the majority's "positive steps" approach is useful in cases where a claimant embarks to start his own business, and/or is not in a work relationship with an entity, but it is not useful for determining if Lowman was engaged in an independent driver-for-hire business. *Lowman*, 178 A.3d at 905. Judge McCullough reasoned that Lowman could not take positive steps toward establishing a driver-for-hire business because no evidence was presented that he has a license to transport passengers, and Act 164 of 2016[11] forbids Uber drivers from providing call-and-demand, *i.e.*, hail, services outside their use of the Uber App. *Id.* at 905–06. Thus, Lowman "could not be a driver-for-hire absent his relationship with Uber." *Id.* at 906.

Although Judge McCullough agreed with the Board's finding that Lowman was customarily engaged in driving, she found wanting the Board's conclusion that Lowman was engaged in an independently established business. *Id. a*t 906–907. According to Judge McCullough, the Department failed to prove that Lowman was not dependent on Uber, *i.e.*, that Lowman was, in fact, capable of working with more than one ride-share company based on the evidence of his Uber driving schedule or that he could refuse assignments without consequence. *Id.* at 908–909 (citing *Danielle Viktor, Ltd. v. Dep't of Labor and Indus.*, 892 A.2d 781, 797-98 (Pa. 2006)). Thus, she concluded that Lowman was not self-employed. *Id.* at 909–910.

The Board sought allowance of appeal, and we granted review of two questions:

(1)     Whether the Commonwealth Court's departure for a half a century of UC jurisprudence and substitution of a new common law test in

---

[11] Act of November 4, 2016, P.L. 1222, No. 64, 53 Pa.C.S. § 57A16(b)(1), (3). *Accord Germantown Cab Co. v. Philadelphia Parking Authority*, 993 A.2d 933, n.6 (Pa. Commw. 2010) ("A taxicab must also have a medallion in order to provide call and demand (hail) service within the City of Philadelphia. 53 Pa.C.S. § 5714.").

derogation of statutory law calls for the exercise of the Pennsylvania Supreme Court's supervisory authority.

(2)     Whether the Commonwealth Court's departure from precedent, which creates uncertainty as to eligibility for benefits, raises an issue of such substantial importance as to require prompt and definite resolution by the Pennsylvania Supreme Court.

*Lowman v. UCBR*, 199 A.3d 862 (Pa. 2018) (per curiam).  Because the issues presented are questions of law pertaining to statutory interpretation of the Act, our scope of review is plenary, and our standard of review is non-deferential.  *Harmon v. UCBR*, 207 A.3d 292, 298 (Pa. 2019).  Moreover, a determination regarding self-employment is a question of law to be determined on the unique facts of each case.  *Accord Danielle Viktor*, 892 A.2d at 791 ("A determination regarding the existence of an employer/employee relationship is a question of law that is determined on the unique facts of each case.") (quoting *Universal Am–Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 330–31 (Pa. 2000)).

## IV. ARGUMENTS

The Board argues that Lowman's activity must be analyzed within the statutory framework of Section 753(l)(2)(B).  It complains that the Commonwealth Court departed from fifty years of precedent by considering whether Lowman took positive steps toward establishing a business rather than considering the relationship between Lowman and Uber to determine if Lowman's activity constituted self-employment.  Board's Brief at 14–15.  Aligning with Judge McCullough, the Board considers the existence of a work relationship a significant factor in analyzing whether a claimant is self-employed:  "[T]he Department cannot declare a claimant to be self-employed without evidence"; that evidence comes from the putative employer in a work relationship with the claimant.

Board's at 28 (citing *Training Associates*, 101 A.3d at 1234 ("[I]n examining whether a claimant is self-employed, the entity that has firsthand evidence of whether the claimant was engaged in self-employment must necessarily be named as a new 'separating employer' in order for that entity to have notice and an opportunity to present such evidence.")). Similarly, the Board is required to assess a claimant's work relationship with a third party to determine eligibility for benefits, whether that relationship is with an employer at the time of separation or with a putative employer who pays the claimant for services performed while the claimant is receiving benefits. *Id.* at 23, 28 (citing *Training Associates*, 101 A.3d at 1233–1234 ("It is critical that all of the facts and evidence regarding the relationship between the claimant and the purported 'separating employer' be presented.")).[12]

The Board reserves the "positive steps" test for "circumstances where there is no work relationship between a claimant and a putative employer to analyze under Section 753(l)(2)(B)." *Id.* at 24. Because Lowman was performing services using the Driver App, examining whether he took any positive steps to create a business does not answer the question the Board was required to address:

> [W]hether [Lowman] was customarily engaged in an independently established trade, occupation, profession, or business, *i.e.*, whether [Lowman] could perform his service for more than one entity, including competitors, with no adverse consequences; whether [Lowman's] ability to perform work did not depend on the existence of Uber; and whether

---

[12] As an amicus aligning with the Board, the Department endorses Section 753(l)(2)(B) as the sole test for determining whether services performed for a putative employer are employment and looks to *Danielle Viktor* as providing objective factors for determining if a worker is self-employed. Department's Brief at 7, 9.

The Pennsylvania Association for Justice ("PAJ") as amicus supports the "positive steps" test as wholly consistent with unemployment compensation precedent and relevant to an analysis of the second prong of Section 753(l)(2)(B). PAJ's Amicus Curiae Brief at 4.

[Lowman] possessed all the necessary perquisites of providing driving services.

*Id.* (citing *Danielle Viktor*, 892 A.2d at 801–02). Summoning the Commonwealth Court's own precedent, the Board challenges the substitution of a subjective standard based on a claimant's intent, which is "reserved for new business endeavors where there is no existing work relationship," for an objective analysis of a claimant's relationship with a putative employer. *Id.* at 29 n.7 (citing *Hartman v. UCBR*, 39 A.3d 507, 511 (Pa. Commw. 2012) ("Neither the intent of the parties nor the terminology used by the parties to describe their relationship is dispositive.")).

The Board also challenges the Commonwealth Court's pronouncement that "[s]hort-term work, **including self-employment**, in which a claimant engages after losing his job, does not render claimant ineligible for unemployment compensation benefits under Section 802(h) of the Act." *Id.* at 30 (citing *Lowman*, 178 A.3d at 902 (emphasis in original)). According to the Board, this assertion "contradicts Section 802(h) of the [UC] Law that unambiguously disqualifies an individual from receiving [benefits] for any week in which that individual is engaged in self-employment." *Id.* at 30–31 (footnote omitted). Nothing in the Act supports the Commonwealth Court's "gratuitous engrafting of a condition onto an unconditional disqualification for self-employment[.]" *Id.* at 31. In other words, the Board argues, the Commonwealth Court's assertion that short-term self-employment is not disqualifying "cannot stand." *Id.*

The Board acknowledges that temporary assignments fail the customarily engaged component of the independence factor. *Id.* at 32 (citing *Minelli v. UCBR*, 39 A.3d 593, 598 (Pa. Commw. 2012) (footnote omitted)). In *Minelli*, the Commonwealth Court agreed with the Board's conclusion that the claimant was free from control and

direction in the performance of the consulting services she provided to D.K. Harris. *Minelli*, 39 A.3d at 597. It also agreed with the claimant's assertion that she was not customarily engaged in an independently established business where she provided services to D.K. Harris for a total of twenty-two hours over a three-day period. *Id.* Distinguishing *Minelli*, the Board reiterates that Lowman was customarily engaged "as he worked most days during his relationship with Uber, earned approximately $350 per week, and that his driving was frequent and prolonged rather than occasional or limited." *Id.* at 33. The Board offers scant discussion of the "independently established" component of the independence factor.

The Board's final challenge is to the Commonwealth Court's instruction that, on remand, the referee take "into account any offset for his earnings from Uber" when calculating Lowman's benefits, *Lowman*, 178 A.3d at 903, which, the Board argues, "is neither contemplated nor permitted by the UC Law." Board's Brief at 35. Citing Section 404(d)(1)(i) of the UC Law,[13] 43 P.S. § 804(d)(1), the Board explains, "The sole instant

---

[13] 43 P.S. § 804(d)(1)(i) provides:

### § 804. Rate and amount of compensation

\* \* \*

(d)(1) Notwithstanding any other provisions of this section each eligible employe who is unemployed with respect to any week ending subsequent to July 1, 1980 shall be paid, with respect to such week, compensation in an amount equal to his weekly benefit rate less the total of (i) the remuneration, if any, paid or payable to him with respect to such week for services performed which is in excess of his partial benefit credit, (ii) vacation pay, if any, which is in excess of his partial benefit credit, except when paid to an employe who is permanently or indefinitely separated from his employment and (iii) the amount of severance pay that is attributed to the week.

when expenses are a factor for a deduction from UC benefits is for the 'sideline business exception' found in Section 802(h) of the UC Law." Board's Brief at 36. Although the Board agrees that the "sideline activity exception" does not apply in this case because Lowman began using the Driver App after he was separated from his full-time position, the Board disagrees that Lowman's expenses can be deducted from his Uber earnings: "Only [Lowman's] gross remuneration is deductible from benefits... . Thus, the Department is without a statutory mechanism to carry out what the Commonwealth Court has directed it to do." *Id.* at 37.

Whereas the Board distinguishes a claimant who is not in a work relationship with a third party from a claimant who is in such a relationship, Lowman argues that the distinction must be made between a claimant who owns a business and a claimant who works a job. Lowman's Brief at 11. In support of his position, Lowman argues that the historic focus of the self-employment exclusion is on whether "an individual owned and controlled a business enterprise, such that upon the business closing he was considered an unemployed **businessperson** rather than an unemployed worker." *Id.* (emphasis in original).[14] Lowman asks this Court to reaffirm that "only individuals truly in business for themselves, with control over that business, are excluded from benefits based on self-employment." *Id.* at 12 (citing *Starinieri v. UCBR*, 289 A.2d 726 (Pa. 1972) (in deciding claim for unemployment compensation benefits, exercise of substantial degree of control

---

43 P.S. § 804(d)(1)(i).

[14] Similarly, amicus Community Legal Services contends that the self-employment exclusion should apply only to persons who operate their own business. Community Legal Services Amicus Curiae Brief at 6.

over corporation is proper test for distinguishing between unemployed "business person" and "worker")). For Lowman, the question is not whether he is an employe or an independent contractor, but whether he is self-employed. *Id.* at 14. Parroting this Court, Lowman favors providing

> for a larger coverage of employes entitled to unemployment compensation than merely those who would be considered employes under the common law, and to include, as Section 753(l)(2)(B) expressly states, "all services performed for remuneration", subject only to the exceptions specified in other provisions of the [Law].

*Id.* at 14–15 (quoting *Dep't of Labor and Indus. v. Aluminum Cooking Utensil Co.*, 82 A.2d 897 (Pa. 1951) (footnote omitted)). Lowman argues that unlike business persons, claimants working a job through another entity would fall within the Act's broad coverage of employees who perform services for remuneration. *Id.*

Lowman asks that we "reaffirm" the business person standard used in *Starinieri* "as the sole test for self-employment" based on ownership and control because workers "who take part-time work, engage in sporadic tasks or assignments, or earn wages from businesses they do not own should not be disqualified because of 'self-employment'"; this approach allows the Court to "uphold the intent of the General Assembly and streamline the analysis for all claimants." Lowman's Brief at 25. In applying the *Starinieri* self-employment standard to his own situation, Lowman asserts that he "does not own and operate a business when he provides rides" using the Driver App because he has "no practical control" over his driver-for-hire activities. *Id.* at 30. According to Lowman, Uber provides the customers; Uber determines the pricing; Uber receives reviews and uses them to determine if a driver may continue using the driver App; Uber does not provide drivers with customer contact information, destination, or the fare charged. *Id.* at 30–31,

34–41 (distinguishing *Danielle Viktor*, where drivers had entrepreneurial control, could develop relationships with customers separate from the limousine companies, and could engage other drivers to undertake their assignments; distinguishing *Aluminum Cooking* where distributors could sell their services at any price they chose). Echoing Judge McCullough, Lowman further claims that he could not operate a driver-for-hire business because he is statutorily precluded from providing rides outside of a transportation network company. Lowman's Brief at 31 (citing 53 Pa.C.S. §§ 5714(f), 57A16) (footnote omitted).[15]

Unlike the Board, Lowman argues that Section 753(l)(2)(B) is to be used only for determining if services are "employment subject to" the Act, not for determining if such services constitute self-employment. Lowman's Brief at 27. Lowman posits that *Laswick v. UCBR*, 310 A.2d 705, 709 (Pa. Commw. 1973),[16] was incorrectly decided because it relied on Section 753(l)(2)(B) to decide whether a claimant was self-employed. He argues that the purpose of the self-employment exclusion "was to disqualify business owners,

---

[15] Amicus The Mon Valley Unemployed Committee and National Employment Law Project presents a public policy argument that online platform workers should be eligible for benefits because the work is precarious and poorly compensated. Mon Valley's Amicus Curiae Brief at 5. Moreover, the unilateral practices of transportation network companies jeopardize a worker's eligibility for unemployment compensation benefits and negatively impacts the broad economic and social benefits of that compensation. *Id.* at 10–16.

[16] *Laswick* was the first appellate case to address whether a worker was self-employed when performing work in relation with another entity. In *Laswick*, the claimant was separated from an employer and receiving benefits when she began selling jewelry through a third party. *Laswick*, 310 A.2d at 705. The Commonwealth Court resolved the question of the claimant's employment status by applying the statutory definitions of employee and employment and Section 753(l)(2)(B). The *Laswick* Court concluded the claimant was an employee of the jewelry company and, as such, remained eligible for benefits, albeit at a reduced amount. *Id.* at 706.

regardless of their relationship to another entity." *Id.* at 28. Because the General Assembly did not identify "self-employment" as work not defined as "employment," the self-employment exclusion necessarily applies only to business persons; it does not "disqualify anyone engaged in work that was not in 'employment as defined in this act.'" *Id.* at 29. Lowman insists: "Driving for UberX is a job, not a business." *Id.* at 33.

Alternatively, Lowman suggests that even application of Section 753(l)(2)(B) results in his eligibility for benefits because the Board failed to establish that his work as an Uber driver satisfies both prongs of that test. Lowman's Brief at 41. To the contrary, he argues, based upon the same evidence referenced in support of his "businessman" standard, that he is subject to control and direction by Uber, and he is not customarily engaged in an independently established business. *See id.* at 42–51 (distinguishing *Beacon Flag Car Co. v. UCBR*, 910 A.2d 103, 108 (Pa. Commw. 2006), where driver was free to complete assignment for client without supervision by putative employer). For these alternative reasons, Lowman contends his work as an Uber driver is not self-employment, which means he is not disqualified from receiving benefits. *Id.* at 52.

Uber received notice of the proceedings from the Department as a putative employer, participated in the referee hearing and intervened in Lowman's appeal where it substantially aligns with Judge McCullough and the Board as to the test for self-employment. Uber's Brief at 13. Specifically, Uber considers the Section 753(l)(2)(B) factors, along with *Danielle Viktor*, to be the test for assessing self-employment; it rejects the Majority's "positive steps" approach and reliance on cases that predate the *Danielle Viktor* holding. *Id.* at 18–19; Reply Brief at 7.

Decrying the "intent" component of the Majority's "positive steps" test as unworkable, Uber argues that considering a claimant's intent would "result in a test that measures whether a particular individual is a good or bad entrepreneur." Uber's Brief at 20.[17] According to Uber, the problem with the "positive steps" test is its focus on the claimant:

> [The test] creates a scenario wherein a company like Uber can have virtually identical relationships with two individuals who each provide transportation services pursuant to an independent contract agreement, yet one can be deemed self-employed and the other can be deemed not self-employed, based solely on the decisions made by those individuals about how to manage their independent transportation businesses. The parties involved (claimants, Uber, Referees, and UCBR) will never know where the line is drawn.

Uber's Brief at 22–23. To restore objectivity and predictability to a self-employment test, Uber urges this Court to apply Section 753(l)(2)(B) and reaffirm *Danielle Viktor* as providing "the governing framework" for determining self-employment. *Id.* at 23.

Uber disagrees with Judge McCullough that Lowman was dependent on Uber because he could not provide driver-for-hire services without a license. Uber's Brief at

---

[17] Uber also compares Lowman's entrepreneurialism to drivers in *Razak v. Uber Techs., Inc.*, 2018 WL 1744467 (E.D. Pa. 2018), who were free from control and "formed their own companies, [] purchased numerous vehicles, hired helpers, advertised, and provided transportation services for competitors and the public at large" and were considered independent contractors for purposes of assessing federal and state wages.

We note that the Internal Revenue Service uses the "common law" test to determine if an employer is required to withhold income, Social Security, and Medicare taxes on behalf of a worker. That test includes twenty factors, grouped into three categories related to the degree of control exercised by the employer: behavioral control, financial control, and the relationship of the parties. Catherine Tucciarello, *The Square Peg Between Two Round Holes: Why California's Traditional Right to Control Test Is Not Relevant for On-Demand Workers*, 13 Seton Hall Circuit Rev. 351, 355 (2017). Given the substantial dissimilarities between the common law test and the two factor analysis set forth in § 753(l)(2)(B), *Razak* is not helpful in our analysis.

25 n.4. Uber explains that Lowman "indisputably had the right to obtain such a license" and to use other lead generation sources, such as Lyft. *Id.* Citing *Danielle Viktor*, Uber posits that Lowman could perform transportation services for any person or company; he could advertise and solicit clients; he could use other lead-generation sources. Uber's Brief at 24–25; Reply Brief at 13. In other words, Lowman was not dependent on Uber for work, even if he did not provide transportation services through anyone else. *Id.* at 26; Reply Brief at 13. Lowman determined his own schedule and could pick which trip leads to accept; he worked on a job-to-job basis. Uber's Brief at 26–27. Lowman had financial control of his situation. *Id.* at 27; Reply Brief at 14–16. From Uber's perspective, these factors demonstrate that Lowman was self-employed and, as such, disqualified from benefits. Uber's Brief at 28; Reply Brief at 17.

Alternatively, Uber submits that applying the "positive steps" test results in the same conclusion. Uber's Brief at 28. According to Uber, Lowman took the following positive steps to establish a transportation business: he entered into a contract with Uber, and he "made deliberate business decisions based on his choices about whether and how to maximize his earnings while performing transportation services[.]" *Id.* at 29; Reply Brief at 12–17. Moreover, because Lowman's "driving was frequent and prolonged, rather than occasional and limited," Lowman was self-employed. Uber's Brief at 29–30 (quoting Board Decision, 4/22/16, at 4).

Although Uber disagrees with the Majority's "positive steps" analysis and its conclusion that Lowman was not self-employed, it embraces the Majority's statement that Lowman's relationship with Uber was not at issue. Uber's Brief at 31. Moreover, Uber endorses the Commonwealth Court's previous rejection of the premise that a person is

either in self-employment or in employment "(i.e. they must be one or the other)". *Id.* at 31, 32 (citing *Training Associates*, 101 A.3d at 1233). Regardless of the test applied to determine Lowman's benefits eligibility, Uber urges this Court to confirm that finding a claimant is not engaged in self-employment for purposes of continuing benefits under Section 802(h) does not necessarily mean that the claimant is an employee for the purposes of unemployment compensation tax assessment. *Id.* at 32–33 (citing *A Special Touch v. Dep't of Labor and Indus.*, 192 A.3d 1238 (Pa. Commw 2018), *reversed*, ___ A.3d ___, 2020 WL 1932622 (Pa. April 22, 2020)).[18]

## V. ANALYSIS

As discussed, the General Assembly has provided a catch-all definition of employment as follows:

### § 753. Definitions

\* \* \*

(B) …Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is

---

[18] The Commonwealth Court concluded that the issue of a claimant's employment status under the Act is not an "either/or" proposition," in that a finding that a claimant is not self-employed for purposes of rendering him eligible to receive benefits does not mean he is an employee of a post-separation entity for purposes of rendering that entity liable for unemployment compensation taxes. *Lowman,* 178 A.3d at 901 (noting that the Board incorrectly framed the issue as whether Lowman was "either self-employed or is an employee of [Uber]") (citing *Training Associates*, 101 A.3d at 1232).

We decline any invitation to consider whether a failure by the Department to meet the burden of proof regarding self-employment has the effect of rendering an individual an employe of the post-separation entity where the post-separation entity participates in the hearing as a putative employer. In this context, neither the Commonwealth Court nor this Court has engaged in a statutory interpretation of the Act including consideration of the specific provision that might arguably bear on the answer to this question, 43 P.S. § 829. Finality of Decision. The issue is not implicated in the present case and we will not address it.

shown to the satisfaction of the department that--(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.

43 P.S. § 753(l)(2)(B).[19]

---

[19] There are also specific definitions of "employment" in the Act. The section immediately following Section 753(l)(2)(B) describes eight specific services for hire that "employment shall also include[.]" 43 P.S. § 753(l)(3)(A–H). In summary format, Section 742(l)(3) specifically defines, with provisos, the following services as employment:

- Services performed for an individual or entity that elects to become fully subject to the Act, 43 P.S. § 753(l)(3)(A);

- Services covered by an arrangement between the Department and the agency of any other state or federal unemployment compensation law, 43 P.S. § 753(l)(3)(B);

- Services as an officer or member of a crew of an American vessel on or in connection with such vessel, 43 P.S. § 753(l)(3)(C);

- Services of an individual who is a citizen of the United States performed outside the United States in the employ of an American employer, 43 P.S. § 753(l)(3)(D);

- Services by an individual performed for remuneration for any person as an delivery driver or traveling salesman, 43 P.S. § 753(l)(3)(E);

- Services by an individual performed for the Commonwealth of Pennsylvania, a nonprofit organization, or a political subdivision, 43 P.S. § 753(l)(3)(F);

- Services performed by an individual in agricultural labor, 43 P.S. § 753(l)(3)(G);

- Domestic service for person who paid cash remuneration of $1,000 or more in any calendar quarter, 43 P.S. § 753(l)(3)(H).

Demonstrating the General Assembly's historical consideration of specific industries and economic factors, certain of these scenarios are specifically defined as employment "notwithstanding any other provision" of the definition of employment. *See*, *e.g.*, 43 P.S. § 753(l)(3)(C). Other scenarios entail services by an individual "other than one who is an employe" under the general definition. *See, e.g.*, 43 P.S. § 753(l)(3)(E). In Section 753(l)(4), the Act also describes nineteen services that "employment shall not include." 43 P.S. § 753(l)(4). It is apparent that each of the specifically categorized scenarios

Given the lack of a definition of self-employment in the Act, the Commonwealth Court has relied on the control and independence factors in Section 753(l)(2)(B) to supply the definition of self-employment when deciding whether an individual, otherwise entitled to the receipt of benefits, becomes ineligible by virtue of his self-employment pursuant to Section 802(h).[20] *See, e.g., Beacon Flag*, 910 A.2d at 107 ("[The] courts have utilized Section 753(l)(2)(B) to fill the void because its obvious purpose is to exclude independent contractors from coverage.").[21] In essence, in the Commonwealth Court, the control and

required policy choices regarding the industry and the worker. Given the burgeoning industry of network transportation companies and the number of drivers necessary for their operation, the General Assembly could certainly decide to specifically address them in the Act.

[20] Recognizing that an employer must pay unemployment compensation taxes based on the wages of an employe in employment, both this Court and our intermediate appellate courts have utilized Section 753(l)(2)(B) to determine whether services performed constituted "employment." *See, e.g., Danielle Viktor*, 892 A.2d at 792 (limousine companies were not liable for unemployment compensation taxes based on services performed by drivers); *Bureau of Employment Securities v. Hecker & Co.*, 185 A.2d 549, 552 (Pa. 1962) (employer was liable for unemployment compensation taxes based on services performed by securities salesmen); *Aluminum Cooking*, 82 A.2d at 899 (company not liable for commissions paid to solicit orders for its cooking utensils); *A Special Touch*, ___ A.3d at ___, 2020 WL 1932622, *12 (Pa. 2020) (employer was responsible for unemployment compensations taxes based on services performed by nail technicians and cleaning personnel); *Carl J. Greco, P.C. v. Dep't of Labor and Industry*, 176 A.3d 1086, 1089 (Pa. Commw. 2018), *appeal denied*, 189 A.3d 384 (Pa. 2018) (corporate law firm was liable for unemployment taxes based on corporate officer services performed by attorney who was sole shareholder and officer of law firm); *Appeal of Baldwin-Lima-Hamilton Corp.*, 244 A.2d 782, 784 (Pa. Super. 1968) (employer was liable for unemployment compensation taxes based on services performed by consultant engineer).

[21] Since the 1973 *Laswick* decision, the Commonwealth Court has applied the two Section 753(l)(2)(B) factors to myriad work scenarios to determine whether a claimant was ineligible for unemployment compensation benefits due to self-employment, with results varying based on the facts of each case. *See, e.g., Training Associates*, 101 A.3d at 1233 (claimant who underwent additional training through putative employer to train its employees was not self-employed); *Pasour v. UCBR*, 54 A.3d 134, 137 (Pa. Commw. 2012) (claimant who provided legal services to clients through attorney referral service

independence factors in Section 753(l)(2)(B) giving rise to an exclusion from "employment" (and thus an exclusion from benefits) have become the default definition of "self-employment."

The question before us is whether it was the intention of the General Assembly to equate one who is engaged in "self-employment," as that term is used in Section 802(h), with one who is not in "employment," as that term is used in Section 753(l)(2)(B). To answer this question, we look to the rules of statutory interpretation. The goal of statutory interpretation is to "ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b). However, when the language is ambiguous, we are guided by several factors set forth in our rules of statutory construction including "the occasion and necessity for the statute," "the circumstances under which it was enacted," "the mischief to be remedied," "the object to

---

was independent contractor); *Minelli*, 39 A.3d at 595-96 (claimant who reviewed clinical records for clients of putative employer was free from control, but not customarily engaged in independently established business); *Silver*, 34 A.3d at 897 (claimant who provided telephone consultation services to clients of putative employer was not self-employed); *Resource Staffing, Inc. v. UCBR*, 995 A.2d 887, 891-93 (Pa. Commw. 2010) (evidence was insufficient to support finding that claimant who provided computer services to client through information technology consulting agency was independent contractor); *Applied Measurement Prof'ls, Inc. v. UCBR*, 844 A.2d 632, 635-36 (Pa. Commw. 2004) (exam proctor who was free from control and direction, paid by the job, and reported earnings on IRS Form 1099 was not employee); *Krum v. Unemployment Comp. Bd. of Review*, 689 A.2d 330, 331-21 (Pa. Commw. 1997) (claimant who provided legal services to clients through attorney/client matching agency was independent contractor); *Venango Newspapers*, 631 A.2d 1384, 1387-88 (claimants who delivered newspapers to Venango's subscribers were independent contractors); *Teets*, 615 A.2d at 990 (claimant who participated in pyramidal sales program with makeup company was not self-employed).

be obtained," and "the consequences of a particular interpretation." *Id.* § 1921(c). We presume that "the General Assembly intends the entire statute to be effective and certain." *Id.* § 1922. Moreover, "where two parts of a statute relate to the same persons or things, those statutory parts are to be construed and considered concurrently, whenever possible." *Cozzone v. W.C.A.B. (Pa Mun./E. Goshen Twp.)*, 73 A.3d 526, 536 (Pa. 2013). "[I]f they can be made to stand together[,] effect should be given to both as far as possible." *Kelly v. City of Philadelphia*, 115 A.2d 238, 245 (Pa. 1955).

The purpose of the Act is remedial and "requires the term 'employment' to be broadly construed to provide for the largest possible coverage of employees[.]" *Danielle Viktor*, 892 A.2d at 795 (quoting *Aluminum Cooking*, 82 A.2d at 898-99). The Act treats "services performed by an individual for wages" as employment until it is proven that the individual is not subject to control and is customarily engaged in an independently established trade, occupation, profession or business. 43 P.S. § 753(l)(2)(B). The entire scheme of the Act is designed around concepts of "employee," "employment" and by extension, employers. The use of the term "self-employment" is one way to describe those scenarios contemplated by the two-factor test in Section 753(l)(2)(B) that preclude a finding of employment. While Pennsylvania courts have instead used the term "independent contractor"[22] as a shorthand for those individuals who are not in "employment," we note that the term "independent contractor" appears nowhere in the

---

[22] As early as 1941, the term "independent contractor" was used to describe an individual who was not an employe within the Act. *See J.G. Leinbach Co., Inc. v. UCBR*, 22 A.2d 57 (Pa. Super. 1941) (affirming Board decision that traveling salesman was employe of company, not an independent contractor). Over time, Section 753(l)(2)(B) became known as the "independent contractor test." *Krum v. UCBR*, 689 A.2d 300, 333 (Pa. Commw. 1997).

Act. Courts could have used the term "in self-employment" just as readily to describe an individual who is not "in employment" for purposes of the Act. In fact, this Court in *Sun Shipbuilding and Dry Dock Co. v. UCBR*, 56 A.2d 254 (Pa. 1948) (discussed infra at 33 n.24), used the terms independent contractor, self-employed and businessman interchangeably in the opinion dealing with a claimant's eligibility for initial benefits when he quit his job to start his own roofing business. The *Sun Shipbuilding and Dry Dock Co.* Court further used the then-extant test in Section 753(l)(2)(B) as the springboard to explain the status of the claimant, a proclaimed businessman, as excluded from the definition of "in employment." *Id.* at 229-30. One who is an independent contractor can equally be described as self-employed.

The General Assembly's use of the term "self-employment" in Section 802(h) as a benefits ineligibility criteria is in sync with Section 753(l)(2)(B) because if an individual is not found to be in "employment," he is not an "employe" covered by the Act. 43 P.S. § 753(i) (defining "employe" as "every individual … who is performing … or has performed services for an employer in an employment subject to this act."). Thus, we conclude the General Assembly intended that Section 753(l)(2)(B) provides the test for determining whether an individual is "engaged in self-employment" as that term is used in Section 802(h). Whether an individual is self-employed, as the term is used in 43 P.S. § 802(h), is to be determined through application of the control and independence factors in Section 753(l)(2)(B).

Our interpretation of Section 753(l)(2)(B) promotes a comprehensive understanding of a claimant's personal services. Unlike the "positive steps"[23] test, which focuses on a claimant's stand-alone activities, Section 753(l)(2)(B) requires a structured two-factor analysis of a claimant's personal services where they are performed within the context of a work relationship with a third party.[24] In any situation, where the challenging party fails to meet its burden of proof as to both components of Section 753(l)(2)(B), the claimant remains eligible for benefits.

Given our determination, we are compelled to reject the Commonwealth Court's novel pronouncement that "[s]hort-term work, **including self-employment**, in which a claimant engages after losing his job, does not render the claimant ineligible for unemployment compensation benefits under Section 802(h) of the Law." *Lowman*, 178 A.3d at 902 (footnote omitted; emphasis added). This statement is facially incompatible with Section 802(h), which provides that any form of self-employment makes the claimant ineligible for benefits. The concept that the Commonwealth Court apparently attempted to embrace would be encompassed by the independence factor, which requires that the claimant be customarily engaged in an independently established business which is an appropriate point for analysis.

In light of our holding that Section 753(l)(2)(B) provides the appropriate framework for determining whether an individual is self-employed, we have rejected Lowman's

---

[23] Either a claimant is self-employed or not. The concept of referring to activities as "positive steps" adds nothing to the analysis of the actual services performed by a claimant.

[24] We express no opinion on the use of a "positive steps" analysis as part of the test for self-employment embodied in Section 753(l)(2)(B) where the personal services are performed by an individual in a stand-alone context. *See e.g., Buchanan* and *Teets*.

argument that we rely on *Starinieri* for a self-standing definition of self-employment, i.e., a "businessman" model. The issue before this Court in *Starinieri* was whether a minority shareholder, director or officer in a closely-held corporation was entitled to unemployment compensation benefits when the corporation ceased doing business as a result of a voluntary petition for bankruptcy filed by the company. *Starinieri*, 289 A.2d at 726-27. The issue in *Starinieri* was not whether the claimant (Starinieri) was self-employed but whether his termination from employment was a voluntary quit, i.e., whether by virtue of the bankruptcy filing, he made the decision to end his employment, thereby making him ineligible for unemployment compensation benefits. Although the *Starinieri* opinion is short on factual development, it is clear that the case arose from a claim for benefits for services performed for the bankrupt company. The nature of the dispute and the precedent relied on by the *Starinieri* Court[25] establishes that the court's focus on the

---

[25] The *Starinieri* court relied on two Superior Court cases: *Freas v. UCBR*, 191 A.2d 740 (Pa. Super. 1963) (where claimants are the principal officers and controlling stockholders of corporate employer and corporation fails, claimants ineligible for compensation because their unemployment was due to voluntarily leaving work without cause of a necessitous and compelling nature) (citing cases), and *Roccograndi v. UCBR*, 178 A.2d 786 (Pa. Super. 1962) (officers and shareholders who were family members and held meetings to decide which members of family would be laid off during periods of insufficient work were not entitled to unemployment compensation benefits after layoff).

In addition, the *Starinieri* Court cited this Court's decision in *Sun Shipbuilding and Dry Dock Co. v. UCBR*, 56 A.2d 254 (Pa. 1948), for the general proposition that the Unemployment Compensation Law was not enacted to compensate individuals who fail in their business ventures and become unemployed businessmen. *Starinieri*, 289 A.2d at 727. The *Sun Shipbuilding* decision, however, sheds no light on the definition of self-employment. Dawkins was employed by Sun Shipbuilding. On August 4, 1945, he left that job to engage in business for himself as a roofer. His official separation slip stated: "Quit, going into business for myself." He applied for unemployment benefits on August 30, 1945. His roofing business failed in November 1945. His benefits claim base year was 1944, when he was employed by Sun Shipbuilding. He was awarded benefits, which were affirmed at each level of appeal, by Sun Shipbuilding. *Id.* at 255-56.

question of the claimant's degree of control over the company's operation[26] was to

determine whether the claimant was in a position to direct the filing of the voluntary

_____

On appeal by Sun Shipbuilding to this Court, we reversed.  We held that quitting a job to start a business was not "good cause" to voluntarily terminate one's employment so as to be entitled to unemployment compensation benefits pursuant to the then-extant requirement.  After reviewing the "intendments" of the Act, the Court held:

These intendments make clear that those within the protection of the Act are "unemployed workers."  By that last quoted phrase is meant **those who while working for wages become unemployed**.  In that class there is not included those who work for wages but who voluntarily removed themselves from the latter class to become independently engaged in a business of their own.

*Id.* at 255-60 (emphasis in original).

To be clear, there was no question that Dawkins quit to start his own business.  He so stated when he left his employment.  Like *Starinieri, Freas* and *Roccograndi*, the issue before the court was a claimant's entitlement to benefits because of the reason for his separation from employment.

[26]  In 1983, the General Assembly amended the Act to provide:

§ 802.4.  Eligibility of officers of a corporation deemed to be self-employed persons:

(a) Notwithstanding any other provision of this act, an officer of a corporation deemed to be a self-employed person because he exercised a substantial degree of control over the corporation and who becomes unemployed due to the fact that the corporation enters into involuntary bankruptcy proceedings under the provisions of Chapter 7, Title 11 of the United States Code shall be entitled to receive unemployment compensation under this act: Provided, That the wages paid to the officer of a corporation deemed to be a self-employed person were mandatorily subject to this act.

(b) Unemployment compensation shall be paid to an officer of a corporation deemed to be a self-employed person, who is eligible under the provisions of this section, in the same manner and to the same extent as unemployment compensation paid to any other eligible claimant under the provisions of this act.

bankruptcy petition, which ended the company's ability to employ the claimant and precipitated the claim for benefits. *Id.* at 727 (The termination of appellant's **employment** with Delaware Valley was the result of a voluntary petition in bankruptcy…) (emphasis added).

*Starinieri* is further cabined by its precise consideration of the claimant's shareholder status and the extent of it. Although the *Starinieri* Court rejected the claimant's reliance on a now-repealed section of the Unemployment Compensation Act (43 P.S. § 753(x)(10)), that section dealt specifically with consideration of the specific ownership interest in a business entity (50% or more) and the familial relationship of such consolidated majority owners. In this context, Lowman's argument that *Starinieri* should be read as this Court's general definition of "self-employment" by applying the substantial control of a business entity test to him does not advance his cause because as his briefing to this Court establishes, the model he suggests implicates factual issues involving control and independence. *Starinieri* is not helpful to resolving Lowman's case. It begs the question of whether he is a self-employed business owner – the question that must be answered by application of the control and independence factors set forth in Section 753(l)(2)(B).

## A. Section 753(l)(2)(B)

Section 753(l)(2)(B) contains a presumption of employment: "Services performed by an individual for wages shall be deemed to be employment subject to this act." 43 P.S. § 753(l)(2)(B). This presumption of employment remains "until it is shown to the

---

43 P.S. § 802.4.

satisfaction of the department" that the individual in question is not subject to control and is customarily engaged in an independently established trade, occupation, profession or business. *Id.* The employment presumption ensures provision of the broadest possible benefits to those who experience forced unemployment. *Renne v. UCBR*, 453 A.2d 318, 321 n.4 (Pa. 1982). Indeed, providing benefits to a worker until an employer or the Department demonstrates that he is ineligible for such benefits promotes the General Assembly's policy to help workers who are separated from employment through no fault of their own. 43 P.S. § 752.

The two factors in Section 753(l)(2)(B) are in the conjunctive, and thus the party challenging a claimant's employment status must establish **both** parts of the test to demonstrate that a claimant's services are self-employment. *Aluminum Cooking*, 82 A.2d at 898; *Hecker & Co.*, 185 A.2d at 552. Under the control factor, the evidence must show that the claimant is "not subject to control or direction." 43 P.S. § 753(l)(2)(B)(a). In *Danielle Viktor*, the Department's tax bureau classified the chauffeurs of limousines as employees of certain limousine companies and imposed unemployment compensation taxes on the limousine companies that held the public transport licenses and owned the limousines. The Commonwealth Court reversed this decision and we affirmed, agreeing that in accordance with the two factor test in Section 753(l)(2)(B), the drivers were self-employed independent contractors. *Danielle Viktor*, 892 A.2d at 801. In so doing, we accepted the unchallenged determination of the Department that the drivers were free from control or direction from the limousine companies because before providing services, the drivers did not complete an application or participate in an interview; the drivers could refuse a client or a trip; they could determine the time, place, and destination

of the trip; they were not required to report the progress of the trip; the drivers could determine where or when to make stops or where to go; they could extend services beyond the agreed rental; they were not provided with training, a handbook or uniform; and the drivers were not required to attend meetings. *Id.* at 791-92.

In assessing the control factor, the Commonwealth Court has identified additional indicia of control. *See, e.g.*, *Stauffer*, 74 A.3d at 404-05 (examining whether employer paid claimant fixed rate of pay; withheld taxes from claimant's pay; supplied tools or equipment necessary to perform work; set time and location for work or meetings; and had the right to monitor the claimant's work and review performance); *Glatfelter Barber Shop v. UCBR*, 957 A.2d 786, 790 (Pa. Commw. 2008) (examining who set hours of operation, how and when claimant was paid, who set price for services, who provided equipment and supplies, whether claimant was required to attend meetings and give notice of vacation, whether claimant executed non-compete clause and was subject to supervision of work). No one factor resolves the control factor, and the determination must be made based on the unique circumstances of each case.

The independence factor of Section 753(l)(2)(B) addresses whether the claimant is "customarily engaged in an independently established trade, occupation, profession or business." 43 P.S. § 753(l)(2)(B)(b).[27] "Customary" is defined as 'commonly practiced, used, or observed," and "engage" is defined as "to employ or involve oneself; to take part in; to embark on." *Staffmore, LLC v. UCBR*, 92 A.3d 844, 847 (Pa. Commw. 2014)

_____

[27] In *A Special Touch*, ___ A.3d ___, 2020 WL 1932622 (Pa. April 22, 2020), this Court's most recent pronouncement on Section 753(l)(2)(B), we held that the phrase "customarily engaged" as used in that section "mandates that an individual actually be involved in an independently established trade, occupation, profession, or business." *Id.* at *1.

(quoting Merriam-Webster's Collegiate Dictionary 308 (11th ed. 2004) and Blacks Law Dictionary 608 (9th ed. 2009)) (emphasis omitted). As a result, "the fact that an unemployed person agrees to accept, and thereafter does accept, an occasional offer of work is simply not enough to demonstrate that said individual is customarily engaged in an independently established trade, occupation, profession or business." *See, e.g., Silver*, 34 A.3d at 898.

Analysis of the independence factor of Section 753(l)(2)(B) also requires consideration of whether a claimant's services are related to an "independently established trade, occupation, profession or business." In this regard, this Court in *Danielle Viktor* dissected the meaning of "independently":

> not dependent: as … not subject to control by others:[28] not subordinate: self-governing, autonomous, free … not affiliated with or integrated into a large controlling unit (as a business unit) … not requiring or relying on something else (as for existence, operation, efficiency).

*Danielle Viktor*, 892 A.2d at 794–795 (quoting Webster's Third New International Dictionary 1148 (1986)). A substantial portion of the Court's opinion analyzed and then rejected the Department's contention that one engaged in an independently established business must bear the sole risk of loss if expenses exceed income, which requires a proprietary interest in the assets of the business. In concluding that the limousine drivers operated independent businesses despite the lack of significant proprietary interest in

---

[28] In *Danielle Viktor,* we noted that an analysis of control plays a part in both prongs of the Section 753(l)(2)(B) test. As to the control factor, the analysis focuses on control over the manner in which services are delivered, while in the context of the independence factor, the focus is on the exercise of control over whether the services are required to be performed. *Danielle Viktor*, 892 A.2d at 797 n.15.

certain of the assets of their businesses, we noted that the Commonwealth Court properly relied upon a number of considerations:

> The Commonwealth Court did not rest its determinations solely on the fact that Drivers were free to work for more than one company. The court considered the facts that Drivers were hired on a job-to-job basis, could refuse any assignment, and were not dependent on Appellees for ongoing employment. Henderson Commonwealth Court Opinion at 13. Further, the court also specifically determined that Drivers suffered a risk of loss if expenses exceeded income, for the evidence suggested that they bore a material financial risk, and the Department's requirement that they alone must bear the risk of loss "has no basis in law."

*Id.* at 797-98. As discussed, we rejected the Department's contention that they were not "in business for themselves" because they lacked a "proprietary interest" in the business since they did not own the assets of the limousine services, including, for example, the PUC licenses or the limousines themselves. *Id.* at 800. While noting that ownership of a proprietary interest in the business may be a relevant factor in determining the independence factor of Section 753(l)(2)(B) it was not a requirement for a finding of an independently established business. The Court noted that the Department failed to acknowledge the realities of the luxury limousine business, in which it was unlikely that most drivers could ever obtain the necessary PUC license to operate such a business, given the expensive and lengthy process required for licensing. *Id.* at 800-01. We concluded as follows:

> The record supports the holdings of the Commonwealth Court that Appellees demonstrated that Drivers met subsection (b), **for several reasons, including**: (1) the Driver's ability to perform their services for more than one entity, including competitors, with no adverse consequences; (2) the operation of their businesses and their ability to perform work did not depend on the existence of any one of the Appellees; and (3) the fact that Drivers bring all necessary perquisites of providing driving services to limousine companies, even though they do not own the limousines or bear all of the financial risk.

*Id.* at 801–02 (emphasis added).

In at least one case, the Commonwealth Court organized the factors considered in *Danielle Viktor* into three dispositive categories: (1) whether the individual is able to work for more than one entity; (2) whether the individual depends on the existence of the entity for ongoing work; and (3) whether the individual was hired on a job-to-job basis and could refuse any assignment. *A Special Touch*, 192 A.3d at 1242, *reversed*, ___ A.3d ___, 2020 WL 1932622 (Pa. April 22, 2020) ("Our Supreme Court has established a three-part test for determining whether the putative employee is engaged in an independently established trade, occupation or business, i.e., the second prong.") (internal quotation marks omitted). To the extent that the Commonwealth Court interprets *Danielle Viktor* to create an exclusive "three part test" as the governing framework for determining the independence factor of the self-employment test in Section 753(l)(2)(B), it misconstrues *Danielle Viktor.* To the contrary, in *Danielle Viktor* we made clear that all relevant factors presented in a given case should be considered when determining whether a business is independently established. *Danielle Viktor*, 892 A.2d at 797–798. As such, the three considerations referenced in *A Special Touch* are not exclusive, but rather are just three among many relevant factors to be considered in analyzing the independence factor, depending upon the facts and circumstances of a particular case. Contrary to the Commonwealth Court's nomenclature in *Special Touch*, there is **no** freestanding "*Danielle Viktor* test."

While the independence factor may be established through evidence that the claimant has acquired the traditional trappings of a business, *e.g.*, a license, a lease, an ownership interest in the assets of a trade or business, business cards, clients,

advertising, and/or evidence related to the other factors considered by this Court in *Danielle Viktor,* we reiterate that, like the control factor, no one circumstance is dispositive, and each case must be addressed on its unique facts.

Uber suggests that resolution of the self-employment issue applying the Section 753(l)(2)(B) factors includes consideration of what a claimant could do to establish a business, *e.g.*, Lowman "indisputably had the right to obtain" the "appropriate license … necessary to pick up street hails." Uber's Brief at 25 n.4. While it is highly disputable that such "right" translates into an attainable reality, looking at what a claimant could do—or could have done—to be customarily engaged in an independently established business begs the question of whether he is, in fact, so engaged in such a business and, therefore, ineligible for benefits under Section 802(h). In the context of determining whether an individual is engaged in self-employment and therefore, ineligible for benefits, an analysis using Section 753(l)(2)(B) does not evaluate what a claimant could do, but what he has done and/or is doing in terms of providing personal services for remuneration. Looking at a claimant's real-time activities through the lens of Section 753(l)(2)(B) avoids speculation based on hypothetical considerations and aids in evaluating a claimant's actual status for eligibility purposes.[29]

---

[29] We recognize that in *Danielle Viktor* we noted that the drivers for each of the limousine companies "could and did drive" for other limousine companies. *See, e.g.*, *Danielle Viktor*, 892 A.2d at 787, 790. We likewise noted that the sales persons in *Aluminum Cooking* could and did sell the aluminum products of competitors. *Id.* at 898. Neither of these cases squarely decided the issue of whether the mere opportunity to provide services for anyone other than the putative employer was sufficient to be given weight in the determination of the independence factor.

As detailed by Lowman, Lowman's Brief at 44 n.11, the Commonwealth Court has likewise focused on whether a claimant has actually performed services for anyone other than the putative employer. *See, e.g., Staffmore, LLC v. Unemployment Comp. Bd. of*

## B. Application of the Section 753(l)(2)(B) Test
## to Lowman's Relationship with Uber

### I. The Control Factor

As discussed, the determination of whether Lowman was free from control or direction over the performance of his driving services requires consideration of the facts concerning the actual working relationship between Lowman and Uber. Pursuant to Section 753(l)(2)(B), the freedom from control or direction must be both "under his contract of service and in fact …." "Control … is not a matter of approving or directing the final work product so much as it is a matter of controlling the means of its accomplishment." *CE Credits OnLine v. Unemployment Comp. Bd. of Review*, 946 A.2d 1162, 1169 (Pa. Commw. 2008). Based on our plenary review of the evidence, we conclude as a matter of law that Lowman was not free from Uber's direction or control.

While many cases have discussed and extracted indicia of control, we find the most weighty and thus dispositive factors in this case to include: the required application process; the inability to use a substitute to provide services; Uber's monitoring, review and supervision of Lowman's performance; pay structure; provision of tools and equipment.[30]   *See, e.g., Stauffer,* 74 A.3d at 404-05; *Quality Care Options v.*

---

*Review*, 92 A.3d 844, 849 (Pa. Commw. 2014); *Stauffer v. Unemployment Comp. Bd. of Review*, 74 A.3d 398, 407 (Pa. Commw. 2013); *Stage Rd. Poultry Catchers v. Dep't of Labor and Indus.*, 34 A.3d 876,892 (Pa. Commw. 2011); *Gill v. Dep't of Labor and Indus.*, 26 A.3d 567, 570 (Pa. Commw. 2011); *Schneider v. Unemployment Comp. Bd. of Review*, 12 A.3d 754, 757-58 (Pa. Commw. 2010).

[30] The learned Dissent takes exception to our conclusion that application of the control factor test results in the conclusion that Lowman was not free from Uber's direction and control. Dissenting Op. at 2. However, the Dissenting Opinion makes no effort to suggest that the factors we find most weighty and dispositive are inappropriate in the context of the totality of the circumstances. Indeed, of the five factors we most heavily weighted, the Dissent selectively discounts only some of them. It singles out its perceived

*Unemployment Comp. Bd. of Review*, 57 A.3d 655, 660, 659 (Pa. Commw. 2012); *CE Credits OnLine,* 946 A.2d at 1169 (Pa. Commw. 2008); *Beacon Flag*, 910 A.2d at 108.

Immediately after his separation from employment, Lowman opted to seek a source of income by tapping into a readily available opportunity to become a driver-for-hire. To do so, by statute, he had to obtain access to a transportation network company. He chose Uber.

Uber describes itself as "a technology company" with a "mobile app based marketplace that matches up transportation providers with individuals looking for rides," N.T. (Referee Hearing), 10/29/2015, at 6. Translated into practice, Uber creates an inventory of passengers and it utilizes drivers, like Lowman, to service that inventory on demand.

To access Uber's passenger inventory, Lowman had to file an application for a license to use the Driver App. As part of the application process, Lowman had to undergo a background check and verify to Uber that he had a valid driver's license, automobile liability insurance, a properly registered vehicle, and workers' compensation insurance. Agreement, ¶¶ 2.3, 3.1, 3.2, 8.1-8.4.

Although Lowman provided his own vehicle and cellphone, which was necessary to access the Driver App, Uber required that Lowman's personal vehicle and cell phone meet its criteria regarding age and condition to be authorized for use. Agreement, ¶¶

---

insignificance of the tools provided to Uber, specifically, Uber's provision of access to Lowman of the Uber App. *Id.* at 2. As discussed, this is the essential tool for the provision of ride share services. It is the only way in which Lowman can gain access to the inventory of riders created by Uber. The Dissent also takes exception to the lack of weight given to the fact that Lowman received an IRS 1099 Form. *Id.* While we did not give weight to it, we did not ignore it. For the reasons discussed, unilaterally imposed categorization or description of the relationship is not conclusive in light of the totality of circumstances.

1.16, 1.17, 2.6.23.1-23.3. While the vehicle and cell phone as specified were provided by Lowman, these "tools and equipment" were useless without the predicate tool necessary to provide driving services, Uber's Driver App. This fundamental tool for the provision of the service was provided by Uber – without it, Lowman could provide no service. It was the sole means by which he connected, met, or interfaced with a passenger.

Although the Driver App allows a driver to provide rides for remuneration, Uber generated the passenger leads, unilaterally determined the passenger fares and the driver's percentage, collected the fares, retained its service fee, and then paid Lowman. Agreement, ¶¶ 4.1–4.8.

Uber exercised total control over the provision of service because Lowman personally had to fulfill the passenger assignment. He could not hire a substitute driver to provide a ride to a passenger identified by Uber. Agreement, ¶ 5.2.

In the virtual world in which Uber operates, it monitored and supervised Lowman's provision of driving services. Although Lowman was not obligated to have the Driving App activated, while Lowman was using the Driver App, Uber could track his location through its geolocation services, remaining involved in real-time in the actual driving assignment– it knew his location at all times when he was logged in, including when he was providing a ride to the Uber passenger. Agreement, ¶ 2.7. The technology gave Uber real-time reporting on the progress of the service Lowman provided including the time it took for each ride. The GPS tracking was used by Uber to retroactively adjust a fare based upon a driver's inefficient route. Agreement, ¶ 4.3. Nor could Lowman deviate

from the destination provided by the passenger when requesting the ride service from Uber.  Agreement, ¶ 2.3.

Uber supervised Lowman's work, using passenger ratings of his services. Although the reviews of Lowman were conducted by passengers, Uber relied on them to assess Lowman's performance.  Lowman was required to maintain an average rating that exceeded the minimum rating established by Uber.  Agreement, ¶ 2.5.2.  Contractually, Uber could deactivate the Driver App based on failure to maintain an "acceptable rating as determined by Uber."  Agreement, ¶ 2.5.2.  This type of constant assessment of performance is a strong indicia of control by Uber.  *Cf.*, *Beacon Flag*, 910 A.2d at 108 (driver was free to complete assignment for client without supervision or monitoring by putative employer).

Uber also retained the right to deactivate Lowman's access to the network through the Driver App immediately and without notice if he did not qualify to provide driving services under applicable law or Uber's standards and policies.  Agreement, ¶ 12.2.

As is true with its customers, Uber's interaction with its drivers is through its technology.  While there is no training in the more traditional mode of office or conference room meetings, regular emails and text messages advising on the manner in which rides and Lowman's earnings (and by definition, Uber's) could be maximized and approaches to providing positive experiences for customers were utilized by Uber in lieu of face-to-face encounters in brick and mortar meeting rooms.  N.T. (Referee Hearing), 10/29/2015, at 16, 24-25, 26, 38, Lowman Exhibits 6-9, 12, 15 (Uber emails to Lowman with suggestions).

We have considered the totality of the evidence including the provisions of the Uber Agreement, and recognize that there are indicia of the absence of control by Uber over Lowman's driving for hire services. For example, the Agreement identifies Lowman as an independent contractor and he received a 1099 tax form so that taxes were not withheld from his payments from Uber. Agreement, ¶ 4.1; N.T. (Referee Hearing), 10/29/2015, at 11, 33, 34; Board Decision, 4/22/2016, ¶ 13. Although sometimes relevant, we find them here to add little to the analysis. As in *Danielle Viktor,* where we found relevant that the limousine companies eschewed the notion that the drivers were not independent contractors, *Danielle Viktor*, 892 A.2d at 795, here Lowman considered himself an employee. Agreement, ¶ 13.1; N.T. (Referee Hearing), 10/29/2015, at 22, 35–36. While we do not embrace the notion that such subjective intention can drive the outcome, it evidences the lack of conclusive weight such a designation carries.

There is comfort in the conclusion Uber controlled and directed Lowman's performance of driving-for-hire services. Uber, presenting itself as a transportation network company, invites a passenger without any personal contact with anyone, to request a ride from a driver (who will be a stranger). Vetting, monitoring and supervising the provision of services by its drivers is implicit in Uber's services. Giving weight to all of the evidence, we conclude that Uber controlled and directed the performance of Lowman's services as a driver-for-hire.

## II.     Independence Factor

Given the evidence of record, we find that Lowman's activities met the "customarily engaged" aspect of the independence factor. We thus focus on whether his activities constituted an "independently established" business.

Although the control and independence factors in Section 753(l)(2)(B) are articulated as separate considerations, it is apparent that certain indicia considered in the context of the control factor are also relevant in the analysis of the "independently established" aspect of the independence factor. For example, Lowman's inability to share his access to the Uber App with anyone else, Agreement, ¶¶ 1.7, 2.2, prevents Lowman from hiring someone else to provide services to a passenger made available to him by Uber. This is an indication of Uber's control over the manner in which services are provided because the services must be personally performed by Lowman. This contractual prohibition, likewise, divests Lowman of the ability to subcontract business. The ability to hire other drivers to take their riders is a recognized indication of one who is independently engaged in a business. *Danielle Viktor*, 892 A.2d at 785-86. Lowman's relationship with Uber, which prohibits subcontracting, strongly militates against a finding that he is independently engaged in a business.

When Lowman is providing a ride to a passenger, he must display the Uber decal. The fact that this is mandated by statute and not by Uber is inconsequential. It is evidence of the more fundamental fact that Lowman **cannot** provide driving services independent of Uber since Pennsylvania law prohibits individuals from providing commercial driving services in personal unlicensed vehicles. 53 P.S. § 5714(f). Further, Lowman could not build his own client base under the auspices of his Uber relationship because his contract limits his communications with customers to the Uber App and are permitted only for the purpose of providing rides through Uber. Agreement, ¶ 2.2. Even with the Driver App activated, whether or not Lowman would have the opportunity to provide a ride service was determined by Uber which, by way of its algorithm, determines which available driver

will be offered an assignment. *Id.* An Uber customer could not seek out Lowman's services. Thus, Lowman's ability to develop a separate relationship with clients was not existent. This arrangement is in stark contrast to the luxury limousine drivers in *Danielle Viktor* who had their own customers, advertised their services and arranged the trips they provided.

Lowman had no ability to set his compensation for providing a ride service. Although under the Agreement, he could negotiate a lower fare than set by Uber, Uber remained entitled to its fee that was set at the higher rate. Agreement, ¶ 4.1. Since the transfer of funds was between the customer and Uber, it is also unclear from the Agreement how the lower rate would be effectuated since the "payment processing functionality" controlled by Uber still must be used. *Id.* Lowman could not negotiate a higher rate with a passenger. Lowman's inability to set or negotiate his remuneration weighs against a finding of an independently established business.

A countervailing aspect of Lowman's relationship with Uber is that he had the ability to decide whether and when he would activate the Driver App and thus, be available for driving assignments. Moreover, pursuant to the Agreement, Lowman had the right to refuse an assignment of a passenger when the Driver App was activated. Agreement, ¶ 2.4; N.T. (Referee Hearing), 10/29/2015, at 8, 10, 26, 36; Board Decision, 4/22/2016, ¶ 7. Although relevant and somewhat weighty, we do not find these facts to be conclusive as to the determination that his activities amounted to an independently established business. Certainly, this type of discretion on the part of an individual in the traditional workforce is unusual. As we noted in *Danielle Viktor*, it is generally an independent

business person who has this type of unmitigated prerogative. *Danielle Viktor*, 892 A.2d at 797.

However, the world in which Uber and Lowman operate is not the usual workforce. Traditionally, hours of work are set and required by an employer (or putative employer) because the operations of the enterprise are dependent on a set number of workers to accomplish a defined task. In contrast here, the fact that Uber allows all of its licensed drivers to work at their own discretion[31] evidences a decision that there are a sufficient number of individuals with access to the Driver App to ensure that, despite erratic schedules, there will always be a driver available to service passengers requesting Uber's service. The fact that Uber's business model does not require regularly scheduled work hours from its workforce does not translate into an automatic independent contractor relationship.

Moreover, while Lowman could refuse assignments while logged in, the evidence of record does not allow a conclusion as to the repercussions for such refusal. The Agreement contains Lowman's acknowledgment that failure to accept Uber requests creates a negative experience for Uber customers. Agreement, ¶ 2.5.2. The Agreement also gives Uber the right to terminate Lowman's access to the Uber App if Uber decided that Lowman caused harm to Uber through his acts or omissions. Agreement, ¶ 2.4. On this record, we cannot conclude that the right to refuse assignments is not illusory. Thus,

---

[31] This is true only to a point. Lowman had to use the Driver App at least once a month, otherwise, Uber could deactivate the Drive App. Agreement, ¶ 2.1.

despite some arguable indicia to the contrary, we conclude that Lowman was not engaged in an independently established business.[32]

## C. Calculating Lowman's Unemployment Benefits

After reversing the Board's decision, the Commonwealth Court remanded "for further proceedings before the Referee to calculate the unemployment benefits owed to [Lowman], taking into account any offset for his earnings from Uber." *Lowman*, 178 A.3d at 903. The Commonwealth Court explained its instruction in a footnote:

> The Board found Claimant "earned" approximately $350 per week, but the record shows only what he was paid. To know what he "earned" would require information about his expenses, which is not of record. Section 404(d)(1) of the Law authorizes a reduction to an employee's "weekly benefit rate" that exceeds his "partial benefit credit." 43 P.S. § 804(d)(1).

*Lowman*, 178 A.3d at 903 n.10.

The Commonwealth Court's undeveloped rationale can be largely explained by the fact that this aspect of its decision was not briefed by any party before it. The Department

---

[32] Like the Dissent's isolated and selective analysis of the control factors, Dissenting Op. at 2–4, in its critique of our analysis of the independently established business criteria, the Dissent again fails to embrace the notion that we must consider the totality of the circumstances, including the contractual agreement and the dynamic of the industry and the workforce in which Uber and Lowman operate. *Id.* at 4. As discussed, Lowman had no ability to set the rate for the services he provided; had no ability to develop a client relationship with the passengers he serviced using the Uber App; and pursuant to the Uber Agreement, he could not subcontract his work and he could not provide driver-for-hire services unless Uber, by way of an algorithm, offered him an assignment. While we recognize the countervailing aspects of the relationship with Uber, in light of the totality of the circumstances, Lowman was not engaged in an independently established business. While the Board reached a contrary legal conclusion, we are in no way bound by it.

The Dissent's contention that results may vary depending upon the "non-Uber activities" of different drivers does not constitute a criticism of the analysis set forth herein, but rather merely a recognition that individual decisions must be made in specific cases based upon the unique facts presented in each circumstance. *See, e.g., Danielle Viktor*, 892 A.2d at 791; *Universal Am–Can, Ltd.*, 762 A.2d at 330–31.

as the Appellee before the Commonwealth Court did not file a brief, instead relying on the brief of Uber in support of the decision of the Board and the Referee. The issue of the calculation of the offset was not an issue since all previous decisions found that Lowman was self-employed and thus, not eligible for benefits.

The Board now contends that the Commonwealth Court's directive is contrary to the Act. The Board directs us to section 804(d)(1) of the Act, which governs deductions from weekly benefit payments. This section provides, in relevant part, as follows:

### § 804. Rate and amount of compensation

*       *       *

(d)(1) Notwithstanding any other provisions of this section each eligible employe who is unemployed with respect to any week ending subsequent to July 1, 1980 shall be paid, with respect to such week, compensation in an amount equal to his weekly benefit rate less the total of (i) the **remuneration**, if any, paid or payable to him with respect to such week **for services performed** which is in excess of his partial benefit credit… .

43 P.S. § 804(d)(1)(i) (emphasis added). The Board argues that an offset for expenses is only available in situations in which the employe engages in a sideline activity as defined in Section 802(h) which provides that when an employe engages in a "sideline activity," "[n]et earnings received by the employe with respect to such activity shall be deemed remuneration paid or payable with respect to such period as shall be determined by rules and regulations of the Department." *Id.* The Board argues that since the Commonwealth Court correctly concluded that Lowman was not engaged in a sideline activity, it cannot deduct his expenses from his remuneration.

While the Board's argument seems straightforward, the Board complicates its analysis by baldly equating remuneration, as that term is used in Section 804(d)(1), with **wages**. UCBR Brief at 35. While the term remuneration is not defined in the Act, wages

is a defined term.  43 P.S. § 753(x)(1)-(9).  Without further advocacy on this issue, we are unable to engage in an appropriate statutory analysis.[33]  Consequently, we remand to the Commonwealth Court for the appropriate development of this issue and decision.

## CONCLUSION

We affirm the decision of the Commonwealth Court finding that Lowman was not self-employed.  We remand for the purpose of determining the calculation of Lowman's unemployment benefits.

Justices Baer, Todd, Dougherty and Wecht join the opinion.

Chief Justice Saylor files a dissenting opinion in which Justice Mundy joins.

---

[33]  Lowman does not offer any argument or statutory analysis on the appropriate deductions, if any, from the earnings he received from Uber.